2020 IL App (1st) 190465

FIRST DISTRICT
SIXTH DIVISION
August 21, 2020

No. 1-19-0465

| | | |
|---|---|---|
| JULIEN FLOREZ, a Minor, by His Parents and Next of Friends, Aimee Florez and David Florez, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 L 13348 |
| NORTHSHORE UNIVERSITY HEALTHSYSTEM, d/b/a Evanston Hospital; ARMIN MICHAEL DRACHLER, M.D.; NORTHSHORE PHYSICIANS GROUP, LLC, d/b/a Northshore Medical Group; ELIZA MEADE, M.D.; JENNIFER LESKO, M.D.; and LISA WEGRZYN, R.N., | ) ) ) ) ) ) | Honorables Kay M. Hanlon and Thomas Donnelly, |
| Defendants-Appellants. | ) | Judges Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Cunningham concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendants Northshore University Healthsystem, d/b/a Evanston Hospital; Armin Michael Drachler, M.D.; Northshore Physicians Group, LLC, d/b/a Northshore Medical Group; Eliza Meade, M.D.; Jennifer Lesko, M.D.; and Lisa Wegrzyn, R.N. (collectively "defendants") appeal the judgment of $50.3 million entered in favor of plaintiff after a jury trial. On appeal, defendants contend (1) the trial court erred in striking defendants' supplemental disclosures of their previously disclosed expert witnesses, where the disclosures were made in response to plaintiff's supplemental filing, (2) the trial court abused its discretion in excluding all evidence of Julien Florez's autism diagnosis, and (3) opposing counsel's remarks during closing argument for the

jury to "make a statement" concerning the preciousness of children's lives constituted reversible error. For the following reasons, we reverse and remand for a new trial.

¶ 2                                    I. JURISDICTION

¶ 3    On October 9, 2018, after a jury trial, the trial court entered judgment on the verdict in favor of plaintiff. Defendants filed a motion for a new trial, which the trial court denied on February 7, 2019. Defendants filed their notice of appeal on March 6, 2019. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 4                                    II. BACKGROUND

¶ 5                                      A. Pretrial

¶ 6    Plaintiff filed a complaint against defendants, alleging medical negligence regarding the birth of Julien on March 22, 2009. Defendants responded, and discovery commenced with an original trial date of May 15, 2018. On March 16, 2018, 59 days before trial, plaintiff sought to disclose a new witness, Dr. Allecia Wilson, and to supplement disclosures provided by various expert witnesses. The trial court granted plaintiff's request over defendants' objection.

¶ 7    On May 10, 2018, defendants received Julien's medical records from treatment in Michigan spanning a period of six months. Defendants moved to continue the trial date, but the court denied the motion. The case was assigned to another judge for trial, but that judge had a scheduling conflict. She informed the parties that she could either continue the trial or return it for reassignment to another judge. She indicated that if she retained the case, she would allow defendants to take limited discovery of the newly disclosed medical records. Defendants chose to have the case reassigned, and the trial date was moved to September 18, 2018.

¶ 8      On July 25, 2018, 56 days before trial, plaintiff supplemented his answers to written discovery with "a copy of the June 25, 2018 Psychological Evaluation for Julien Florez from the Center for Neuropsychology and Behavioral Health." The evaluation was conducted by Dr. Crystal Young, one of Julien's treaters in Michigan. Dr. Young's report stated that Julien was referred to her for a cognitive assessment and "evaluation of possible Autism Spectrum Disorder (ASD)." Dr. Young performed five tests: Wechsler Intelligence Scale for Children, Peabody Picture Vocabulary Test, Autism Diagnostic Observation Schedule, Developmental Disability—Children's Global Assessment Scale, and Vineland Adaptive Behavior Scales. She also conducted a clinical interview and reviewed records.

¶ 9      Dr. Young concluded that the "[t]est results are suggestive of Moderate Intellectual Disability" and most individuals in this category "will not exceed an early elementary level of acquired academic skill development." She noted that "Mrs. Florez'[s] description of Julien's current ability to recognize some printed words, add, and count to 100, also appears broadly consistent with these expectations." She further concluded that "[f]rom a social and emotional perspective, Julien meets full diagnostic criteria for Autism Spectrum Disorder." She stated in her report that ASD "is a childhood developmental disorder characterized by severe and pervasive impairment in reciprocal social interaction skills and communication as well as the presence of restricted repetitive and/or stereotyped patterns of behavior, interests, and activities."

¶ 10      Defendants forwarded the report to their experts and filed their supplemental disclosures on August 9, 2018. Defendants' experts opined that Julien's autism diagnosis supported the conclusion that his disabilities resulted from a chronic condition rather than an acute injury occurring at birth. Defendants also sought to supplement its answers to disclose Dr. Young as a

witness. Plaintiff moved to strike the supplemental disclosures, arguing that defendants were "trying to inject this new issue into the case." They also argued that the disclosures were untimely, since they were filed less than 60 days before trial.

¶ 11 The motion judge agreed with plaintiff, finding that Illinois Supreme Court Rule 218(c) (eff. July 1, 2014) requires all discovery to be completed no later than 60 days before trial. On the day of trial, defendants moved to continue the trial to conduct additional discovery, and to reinstate the supplemental disclosures stricken by the motion judge. The trial court denied the motions. The court stated that it "checked the dates" and "didn't hear anybody say something that raised a red flag to me misrepresenting the dates."

¶ 12 Plaintiff subsequently filed motion *in limine* No. 19 "barring any reference to autism" at trial. Plaintiff's motion stated that the record contained references to "a possibility of autism," and "[t]he term autism has also come up during the depositions of some treating physicians and experts." Plaintiff alleged that no witness would testify for either party that Julien is autistic. Furthermore, "[n]one of plaintiffs' or defendants' experts have offered an opinion—neither in a discovery deposition nor Rule 213 disclosure—diagnosing Julien Florez with autism." See Ill. S. Ct. R. 213 (eff. Jan. 1, 2018). Plaintiff alleged that "autism implies a genetic component to the brain dysfunction," and no expert testified that Julien has a genetic condition that led to his brain injury. Therefore, autism is irrelevant to the issues at trial and mentioning autism would only serve to confuse the jury. The trial court granted plaintiff's motion *in limine*.

¶ 13                                  B. Trial

¶ 14 Testimony at trial established that Aimee was admitted to Evanston Hospital on March 22, 2009, five days past her due date. All tests and ultrasounds performed prior to her admission

- 4 -

registered normal. Dr. Jennifer Lesko examined Aimee at 12:24 p.m.; as part of the exam, she observed the fetal heart rate as indicated by the fetal monitor. Dr. Lesko explained that the fetal heart rate will accelerate and decelerate. Although accelerations are generally reassuring, there are two types of decelerations worth noting: variable decelerations, in which the drop in heart rate lasts less than 30 seconds and has no temporal relationship to uterine contractions, and prolonged decelerations, where the baby's heart rate drops for more than two minutes before returning to baseline. The fetal heart rate is also monitored for fluctuation or variability. Moderate variability, defined as the fluctuation of the heart rate of more than 6 but less than 25 beats per minute, is a reassuring sign for fetal health. Conversely, where variability is minimal or absent, this may indicate a lack of oxygen to the baby.

¶ 15    At around 2:40 p.m., they broke Aimee's "bag of waters to help with getting contractions to be a little bit more frequent." Dr. Lesko stated that "the abrupt release of water *** can sometimes cause the baby to have a deceleration." At 2:45 p.m., the monitor showed the baby experienced a prolonged deceleration. Dr. Lesko testified that the deceleration was consistent with the breaking of the bag of waters. At 3:45 p.m., Aimee was given an epidural. Dr. Lesko agreed that the prolonged deceleration noted at this time was "consistent with when her epidural was being placed." During her attendance of Aimee, Dr. Lesko noted variable decelerations in the baby's heart rate but it always returned to baseline. She assessed the decelerations as moderate.

¶ 16    Around 5:30 p.m., Aimee had not made significant progress in labor, and Dr. Lesko considered administering Pitocin. Pitocin increases the strength and frequency of contractions to achieve vaginal delivery. In her notes, Dr. Lesko wrote that she did not start Aimee on Pitocin because "given [her] remoteness from delivery and frequency of prolonged decels, [she] may not

make it to have the normal spontaneous vaginal delivery. Patient aware that she may require a c-section." Dr. Lesko testified that although she did not recommend using Pitocin at the time, she wrote that she "would consider it." Around this time, she communicated with Dr. Drachler, who was taking over Aimee's care. In her notes, she wrote that he was "aware and in house."

¶ 17    Dr. Drachler ordered that Pitocin be administered "slowly" in order to augment Aimee's labor. Nurse Wegrzyn testified that at 5:32 p.m., she began administering 2 milliunits of Pitocin to Aimee. At 6:25 p.m., Dr. Drachler formed a care plan to perform a c-section if one of the following events occurred: (1) variability in the baby's heart rate changed from moderate to minimal for more than 30 minutes or (2) if decelerations recurred. By 6:30 p.m., Nurse Wegrzyn increased the dose of Pitocin to 8 milliunits. After 7 p.m., the fetal monitor strip showed a prolonged deceleration. Dr. Drachler ordered a c-section at 9:40 p.m. and Julien was delivered at 10:35 p.m. Dr. Drachler testified that he monitored Julien's heart rate throughout the night and noted moderate variability. He did not believe that the monitor showed minimal variability "until the end."

¶ 18    Nurse Wegrzyn testified that she attended to Aimee most of the day and through the time of her delivery. She noted the variable decelerations of the baby's heart rate, and she testified that the prolonged decelerations she observed would be concerning "at that moment," but overall she was not worried "[b]ecause the variability is still moderate." Nurse Wegrzyn stated that "[v]ariables are not super concerning to us. It's—I mean, a baby could roll on a cord." She would not bring all repetitive variable decelerations to the doctor's attention "because we see those all the time." However, she stated that a prolonged deceleration "is different."

¶ 19    Nurse Wegrzyn testified that she noted minimal variability at 9:10 p.m. and the baby's heart rate never improved. They tried certain maneuvers to assist the baby's heart rate, including

moving the mother's positioning, administering oxygen, and ceasing the use of Pitocin. At 9:40 p.m., Dr. Drachler recommended a c-section. Nurse Wegrzyn stated that fetal monitoring ceased at 10:11 p.m. up to Julien's delivery. She was in the operating room when Julien was born and noticed meconium-stained fluid. Previously, she had not observed any fluid that was stained. At birth, Julien's Apgar score was "1," which she agreed was "bad."

¶ 20    Dr. Drachler testified that when he was born, Julien was "in bad shape." He was lifeless and blue, and his heart had to be pumped to get circulation to his brain. Bradycardia, or an abnormally low heart rate, was present. Dr. Dalia Feltman, a neonatologist, handled Julien's resuscitation. A tube was inserted in his airway and a ventilator assisted his breathing for the first 55 minutes of Julien's life. Dr. Feltman testified that lab results showed the presence of metabolic acidosis, which is one criteria to initiate body cooling. Body cooling is performed by placing the baby on a cooling blanket in order to lower the body temperature. Dr. Feltman testified that cooling the baby's overall temperature "is supposed to slow that further [brain] injury from happening."

¶ 21    Dr. Feltman stated that before subjecting Julien to body cooling, she also observed his physical condition. She explained that when the brain does not appear to be "acting normal" at birth, it could be a sign of hypoxic ischemic encephalopathy, or HIE. Julien exhibited signs of brain dysfunction, such as lethargy and decreased spontaneous activity, so body cooling was administered. Within five hours of his birth, Julien showed signs of seizure activity, and he was given phenobarbital, an antiseizure medication.

¶ 22                          1. Plaintiff's Expert Witnesses

¶ 23    Plaintiff presented Nurse Kathleen Lagana on the issue of whether Nurse Wegrzyn complied with the standard of care in attending to Aimee prior to Julien's birth. Specifically, Nurse

Lagana opined about the use of Pitocin. She explained that contractions reduce the oxygen flow to the baby, and contractions that are too frequent do not allow the placenta enough time to replenish the oxygen reserves. As a result, oxygen flow to the baby is reduced. Nurse Lagana stated that Aimee should not have received Pitocin, given the decelerations observed throughout the afternoon. They needed to figure out what was causing the decelerations, and they did not want to "make it worse by making stronger contractions or closer together contractions." The standard of care required Nurse Wegrzyn to inform Dr. Drachler that Aimee was not tolerating labor and that Pitocin was "contraindicated." Nurse Lagana opined that Pitocin caused an excessive contraction pattern in Aimee.

¶ 24 Dr. Martin Gubernick testified as plaintiff's obstetrics expert. Dr. Gubernick reviewed the fetal monitor strip and noted that following the administration of Pitocin, variability decreased from moderate to minimal, and accelerations disappeared. The strip indicated a prolonged deceleration at 7 p.m. Over the next two hours, before Dr. Drachler ordered a c-section, Nurse Wegrzyn documented repetitive decelerations. He noted that variability in the heart rate remained minimal for three hours leading up to the c-section. Dr. Gubernick opined that Dr. Drachler deviated from the standard of care when he started Pitocin and failed to discontinue the drug when the fetal monitor strip showed a deterioration in the baby's condition, failed to communicate to Aimee the signs of fetal distress, and failed to recommend a c-section at least two hours earlier.

¶ 25 Dr. Ronald Gabriel testified as an expert on brain injury. He noted that all measures of the baby's condition were normal when Aimee was admitted to the hospital. Bradycardia was observed at 10:11 p.m., and it persisted "into at least the first five and probably approaching the first ten minutes of life." Dr. Gabriel explained that HIE refers to a condition involving "an

abnormality of the brain" (encephalopathy), resulting from reduced oxygen in the blood (hypoxia) and reduced blood flow to the organ (ischemia). He agreed that cooling Julien's body was the correct procedure to address HIE. Dr. Gabriel opined that Julien's brain injury occurred "sometime after *** 10:11 at night." He came to that conclusion because Julien was bradycardic at birth and the bradycardia resulted in his brain damage. As additional support for his conclusion, Dr. Gabriel pointed to an EEG that showed Julien's brain suffered ischemia as evidenced by "bursts which is classic for acute lack of oxygen." An MRI "showed an acute injury to the brain diffuse particularly in the white matter."

¶ 26    Dr. Gabriel also pointed to Julien's present condition as support. Although Julien has cerebral palsy, his "motor system" significantly benefitted from the cooling and he is much better than he would have been without the cooling. "The cooling, however, did not have a major impact on his intelligence or his language. *** He only has about 50 words now approaching ten years of age and [he's] barely understandable." Dr. Gabriel concluded that Julien's brain injury occurred shortly before delivery through the first five plus minutes after delivery.

¶ 27    Dr. Robert Zimmerman, a pediatric neuroradiology expert, testified that an MRI taken on March 27, 2009, showed a hypoxic-ischemic injury of the brain. He opined that the injury occurred near the time of birth due to the baby's appearance at birth, and the swelling as shown on the MRI. A hypoxic-ischemic injury occurring at birth causes damage to brain tissue, which then swells. This swelling occurs during the acute phase of the injury and only remains visible for five or six days.

¶ 28    Dr. Allecia Wilson testified as a placental pathologist. She reviewed Aimee's placental pathology slides and observed nothing to suggest the placenta contributed to Julien's brain injury.

She stated that "the hallmark" of placental insufficiency is growth restriction in the baby. The baby "will not have the proper weight, the proper length, and the proper head circumference." Since Julien's measurements were normal, Dr. Wilson concluded that Aimee's placenta was "perfusing normally." She did not believe that the weight ratio between placenta and baby was abnormal, based on Julien's head circumference, weight, and length.

¶ 29    Evidence presented at trial showed that Julien has global delays; exhibits poor strength, balance, and coordination; and has significant speech and language deficits. He requires physical, occupational, and speech therapy. Julien needs help with eating, getting dressed, and for personal hygiene. He also requires 24-hour supervision. Dr. Gary Yarkony examined Julien and developed a plan outlining his lifetime minimal care needs and costs of this care. The present value of the costs of care ranged from $10,489,279 to $11,240,699. The latter amount represented the cost if Julien attends a private school that includes therapy, as opposed to attending public school and receiving outside therapy. Since Julien will not be able to work, plaintiff's vocational expert, David Gibson, concluded that his future lost earnings ranged from $2,525,775 to $4,335,511.

¶ 30                    2. Defendants' Expert Witnesses

¶ 31    Nurse Marcia Patterson opined that Nurse Wegrzyn met the standard of care for an obstetrical nurse. She noted the tracings on the fetal monitor strip but disagreed that the decelerations observed in the afternoon were concerning. Julien's heart rate always returned to baseline which indicated further monitoring rather than a c-section. Although several variable decelerations occurred that evening, Julien's heart rate returned to the baseline, which indicated moderate variability. She testified that a c-section was ordered because although the baby's heart rate showed moderate variability, Aimee's labor was not progressing and a prolonged deceleration

occurred in the evening. Nurse Patterson also opined that the use of Pitocin was appropriate here because Aimee needed assistance to move along her labor. She stated that the amount of Pitocin administered was within standard practice, and it helped to bring the rate of Aimee's contractions under control. In reviewing the fetal heart tracings, Nurse Patterson did not find any indication of excessive contractions connected to the use of Pitocin.

¶ 32     Dr. Julie Jensen, an obstetrician and gynecologist, testified that Julien's heart rate throughout the afternoon was not concerning because it always returned to its baseline with moderate variability. Furthermore, the decelerations correlated with routine procedures, such as breaking the bag of waters, applying an epidural, and changing the mother's position. She stated that Julien's condition was "very stable." She opined that defendants properly monitored the situation and took appropriate measures such as providing Aimee with oxygen, changing her position, and increasing her intravenous fluids.

¶ 33     Dr. Jensen disagreed with Dr. Gubernick and Nurse Lagana's interpretations of the fetal monitor tracings. She testified that the tracings showed a normal baseline with moderate variability and that the heart rate did not drop to minimal variability until after the prolonged deceleration at 9:24 p.m. She observed, however, that even then Julien's heart rate returned to baseline. Dr. Jensen also disagreed with plaintiff's experts that Dr. Drachler should have ordered a c-section prior to this prolonged deceleration because nothing on the strip supported a reason to call for one. Dr. Jensen opined that Dr. Drachler complied with the standard of care when he ordered the c-section at 9:30 p.m.

¶ 34     Dr. Alan Bedrick and Dr. Michael Scher testified as to the cause and timing of Julien's brain injury. Both stated that the tracings on a fetal monitor strip are only "one part of the puzzle"

in determining whether an HIE injury occurred at birth. Rather, "it's critical to look at the cord blood gases and the tracing together, and not just the tracing [by] itself." Dr. Bedrick testified that the examination of the cord blood gases did not support plaintiff's theory that Julien experienced minimal variability leading to bradycardia, which led to HIE injury at birth.

¶ 35    They also agreed that the evidence showed Julien was already significantly injured by March 22, and nothing happened during labor that exacerbated the injury. Dr. Scher explained that HIE can have both acute and chronic causes. In his opinion, Julien's condition was chronic due to the small size of the placenta which, as a result, could not supply Julien with sufficient oxygen. He stated that the fetal-placenta ratio should be 5:1 or 6:1, but, in Julien's case, it was 10:1, which indicated a big baby and that the "placenta was super small." He believed Julien suffered from chronic asphyxia in utero, which caused his brain damage. Although Julien continued to grow, the placenta did not, and that caused injury to his brain, lungs, and heart "over a long period of time in the womb."

¶ 36    Dr. Bedrick testified that an echocardiogram showed the blood vessels in Julien's lungs were thickened and such a condition takes weeks or even months to develop. Julien's inability to breathe on his own at delivery, and his bradycardia, supported this conclusion because they indicated that Julien's brain and lungs were too damaged to make that transition. Dr. Scher testified that the thickened blood vessels in Julien's lungs were caused by lack of blood flow and oxygen. The echocardiogram also showed that Julien suffered from severe arterial hypertension, which thickens the heart muscles. The condition indicates that the heart is not pumping blood well. Dr, Scher testified that this thickening develops weeks before a baby is born and does not occur soon after birth.

¶ 37    Both doctors testified that the fact Julien experienced seizures within five hours of birth supported their conclusion that he did not suffer an acute hypoxic event shortly before birth. Such seizures typically take 12 to 36 hours to develop after an injury. Since Julien had seizures within five hours of delivery, it is more likely that the injury occurred prior to labor. Dr. Bedrick also noted that Julien was limp when he was born, and if his neurological problem resulted from something that happened shortly before his birth, he would be limp and "stay limp." In this case, however, Julien developed very rapid onset of hypertonia (high muscle tone) within 24 hours of being born *** and that is much more consistent with a brain injurious event occurring before."

¶ 38    Dr. Edwina Popek testified about the condition of the placenta. She explained that one umbilical vein takes oxygenated blood from the placenta to the fetus and two umbilical arteries take deoxygenated blood and waste back to the placenta. She stated that there was evidence of inflammation within the umbilical cord and "the only cause that we have is the presence of meconium." Meconium-laden macrophages found in the layers of the placenta meant that "some time has gone by since the meconium got into the amniotic cavity." The umbilical artery also showed evidence of injury associated with exposure to meconium. Dr. Popek believed "it takes approximately 16 hours of heavy exposure to meconium" to observe such an injury.

¶ 39    Dr. Popek also remarked on the size of the placenta in relation to Julien, noting that it was small. She stated that babies can continue to grow with a small placenta because the organ has about a 30 percent reserve capacity. The baby may be fine for a while, but then "the placenta doesn't have enough oomph to get the baby through those last stages of the pregnancy."

¶ 40    Dr. Richard Towbin testified regarding the timing of Julien's injury. Based on the MRI, he determined that Julien's injury must have occurred at least seven days earlier, between March 12

and March 20, 2009. He explained that there are three phases of brain injury. The acute phase of the injury "is where the dominant feature is swelling." The swelling peaks a few days after the injury and, as it subsides, fluid takes its place. This second, subacute phase can last for weeks or months. The last phase, chronic, is reached when these injury-related changes end. Dr. Towbin testified that the MRI showed Julien's brain was already transitioning from the acute to subacute phase, which could not happen if he had been injured at or around his birth. He disagreed with Dr. Zimmerman's conclusion that, based on the MRI, Julien's injury occurred at the time of birth. Dr. Zimmerman's opinion did not account for the fact that Julien had been placed on a cooling blanket which slows the rate of damage to the brain.

¶ 41     Dr. Scott Hunter testified as an expert in the evaluation of children's cognitive abilities and their current and future needs. He reviewed Dr. Yarkony's life care plan for Julien and Dr. Gibson's economic plan. He stated that it was too early to assume Julien would never be able to live independently or be employable. He found that Julien's nonverbal reasoning ability was low/average, but with the proper interventions, Julien could have "areas of independence." Dr. Hunter believed that Dr. Yarkony's opinion reflected "a worst-case scenario" for Julien.

¶ 42     Outside the presence of the jury, defendants made several offers of proof. Dr. Bedrick and Dr. Scher would testify that the autism diagnosis supported their opinion that Julien suffered from chronic uteroplacental oxygen insufficiency, resulting in injury before birth. Dr. Scher would state that from his knowledge, autism spectrum disorder is either "a genetic problem at conception or acquired or both. And the acquired injury fits into the general uteroplacental insufficiency problem because of the areas of the brain that are injured." It is "one more piece of evidence" in determining the timing and cause of Julien's brain injury. Dr. Scher would opine, to a reasonable degree of

medical certainty, that an autism diagnosis "is consistent with and supportive of my opinion that Julien Florez did not suffer from an acute injury at or around the time of labor and delivery." Dr. Scher would testify that in his review of the records, he did not find a previous confirmed diagnosis of autism. The only references to the disorder came from school psychologists without objective testing to support it. Without an objective test to confirm an autism diagnosis, Dr. Scher could not offer an opinion to a reasonable degree of medical certainty that Julien had autism, nor could autism be a basis of his opinion.

¶ 43    Dr. Hunter would testify that the autism diagnosis "provides a much stronger understanding of *** [Julien's] neurodevelopmental profile." Specifically, that his language deficits do not reflect an intellectual disability; rather, they reflect "a neurodevelopmental disorder that affects language." From his experience working in the area of evaluating children's cognitive abilities and assessing their current and future needs, Dr. Hunter would find the autism diagnosis "to be a critical component to understanding both where Julien is now, *** and what he needs to actually allow him to be successful." Dr. Hunter would agree with Dr. Scher that the prior references to autism in the record did not constitute an actual diagnosis. While recommendations for formal testing were made, Julien did not undergo such testing, or obtain an actual diagnosis, until Dr. Young's evaluation. Until that time, Dr. Hunter "had no data that would suggest that [autism] had been identified or diagnosed."

¶ 44    In her offer of proof, Aimee would testify that prior to the family moving to Michigan, none of Julien's providers, teachers, or doctors had diagnosed him with autism. Although he had deficits associated with autism spectrum disorder, he was not diagnosed with the disorder in Florida. She would confirm that no physicians in Florida indicated to her that Julien may be autistic

and that one physician, Dr. Jeffrey Brosco, told her that Julien was not on the autism spectrum. Aimee confirmed that Julien now attends a school for autistic children.

¶ 45    Following closing arguments, the jury returned a verdict in favor of plaintiff for $50.3 million. Defendants filed a motion for a new trial, which the trial court denied. The court did not believe that defendants were "materially prejudiced" by the exclusion of Julien's autism diagnosis because "[a]utism doesn't seem to be material to this case." It found that autism is "at best, an alternative. *** Material to me means related to the substance of what your theory of the defense is. And I just didn't find that." This appeal followed.

¶ 46                                III. ANALYSIS

¶ 47    Defendants contend that the trial court erred in striking their supplemental disclosures pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) as untimely under Rule 218(c) and excluding any reference to Julien's autism diagnosis at trial. The issue here is not simply whether the trial court properly struck defendants' supplemental answers because they were filed less than 60 days before trial. The question we must answer is whether Rule 213(i) and Rule 218(c) allow defendants to file supplemental answers less than 60 days before trial, where they filed their answers in response to additional information plaintiff himself filed less than 60 days before trial. See Ill. S. Ct. R. 213(i) (Jan. 1, 2018); R. 218(c) (eff. July 1, 2014). Although the admission of evidence pursuant to Rule 213 lies within the sound discretion of the trial court (*Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004)), interpretation of the supreme court rules is reviewed *de novo* (*Vision Point of Sale, Inc. v. Haas*, 226 Ill. 2d 334, 342 (2007)).

¶ 48    It is well-settled that reviewing courts should interpret the rules "in the same manner as statutes." *Id.* When construing a supreme court rule, our primary goal is to ascertain the intent of

the drafters as indicated by the language used, given its plain and ordinary meaning. *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 22. In making this determination, "a court must consider the rule in its entirety, keeping in mind the subject it addresses and the apparent intent of the drafters in enacting it." *Id.* We interpret the rules so that no part is rendered meaningless or superfluous, nor will we depart from the plain language of the rule by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. *Id.*

¶ 49    Rule 213(f)(3) provides that, upon written interrogatory, each party must disclose the subject matter, conclusions, and opinions "and the bases therefor," of controlled expert witnesses who will testify at trial. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). The purpose of Rule 213(f) "is to prevent unfair surprise at trial, without creating an undue burden on the parties before trial." Ill. S. Ct. R. 213, Committee Comments (adopted Mar. 28, 2002). The information disclosed in a Rule 213(f) answer, or in a discovery deposition, "limits the testimony that can be given by a witness on direct examination at trial." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018). Each party also has a continuing duty "to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2018); *Warrender v. Millsop*, 304 Ill. App. 3d 260, 265 (1999). The rule's disclosure requirements "are mandatory and subject to strict compliance by the parties." *Sullivan*, 209 Ill. 2d at 109.

¶ 50    While Rule 213 provides no specific time limit within which to file supplemental answers, Rule 218(c) states that the "dates set for the disclosure of witnesses *** and the completion of discovery shall be chosen to ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates that trial will commence." Ill. S. Ct. R.

218(c) (eff. July 1, 2014). Together, Rules 213(f)(3), 213(i), and 218(c) ensure that the "parties disclose the subject matter, conclusions, opinions, bases, qualifications, and all reports of a witness who will offer opinion testimony," no later than 60 days before trial. See *Scassifero v. Glaser*, 333 Ill. App. 3d 846, 855 (2002); *Gee v. Treece*, 365 Ill. App. 3d 1029, 1035-36 (2006).

¶ 51 Rules 213 and 218, however, should "be liberally construed to do substantial justice between or among the parties." Ill. S. Ct. R. 213(k) (eff. Jan. 1, 2018); R. 218(c) (eff. July 1, 2014). Accordingly, this court has held that Rule 218(c) does not automatically require the trial court to bar an expert witness disclosed less than 60 days before trial. *Frulla v. Hyatt Corp.*, 2018 IL App (1st) 172329, ¶ 27. In *Frulla*, the trial court set the trial date for March 3, 2017, and ordered plaintiff to serve supplemental disclosures by November 21, 2016. The order also set January 5, 2017, as the deadline for defendants' disclosures. *Id.* ¶¶ 6-7. Plaintiff, however, failed to file his supplemental disclosures until December 6, 2016.On January 5, 2017, the trial court ordered defendants to serve their Rule 213(f)(3) disclosures by January 20, 2017. Plaintiff objected, arguing that he had not waived the requirement that discovery be completed no later than 60 days prior to trial. Defendants filed their initial disclosures on January 20, 2017, and filed an amended disclosure on January 23, 2017. *Id.* ¶ 8.

¶ 52 On appeal, plaintiff argued that the trial court erred in failing to bar defendants' expert witnesses for noncompliance with Rule 218(c). He contended that pursuant to the rule's 60-day requirement, defendants had an " 'affirmative duty' " to make their Rule 213(f)(3) disclosures no later than January 3, 2017. *Id.* ¶ 24.

¶ 53 This court noted that, in November 2016, plaintiff knew that the court set a schedule for defendants to make their Rule 213 disclosures by January 5, 2017, past the 60-day deadline, yet

"plaintiff stood mute" and did not object. *Id.* ¶ 25. Furthermore, "[p]laintiff was dilatory in making his own disclosures," which necessarily delayed defendants' disclosures because their "experts typically would need time to review the discovery from plaintiff's experts in order to formulate their opinions and prepare their reports." *Id.* ¶ 28. We found it "clear that plaintiff is attempting to enforce the letter of Rule 218(c) to his advantage without regard to its stated purpose while ignoring his own counsel's lack of diligence in providing discovery disclosures to defendants' counsel." *Id.* ¶ 29. We held that the trial court did not abuse its discretion when it allowed defendants "to disclose experts less than 60 days before trial in order to do substantial justice between the parties." *Id.* ¶¶ 28-29; see also *Gee*, 365 Ill. App. 3d at 1038 (finding that "a mechanical application of the 60-day deadline under the circumstances presented could encourage parties to cause delays which might force opposing parties into a late disclosure of alternate witnesses, thereby unfairly gaining a tactical advantage").

¶ 54    As in *Frulla*, we find that the trial court below should have allowed defendants to file their supplemental answers in order "to do substantial justice between and among the parties" (see Ill. S. Ct. R. 218(c) (eff. July 1, 2014)). On July 25, 2018, 56 days before trial, plaintiff supplemented their answers to written discovery with "a copy of the June 25, 2018 Psychological Evaluation for Julien Florez from the Center for Neuropsychology and Behavioral Health." The report stated that Dr. Young performed the evaluation on June 25, 2018, and the "[r]esults and recommendations were discussed with Julien's family" on that date. On August 9, 2018, two weeks after defendants received the report, they filed their supplemental answers to plaintiff's Rule 213(f) interrogatories. Rule 213(i) obligates a party "to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R.

213(i) (eff. Jan. 1, 2018). In those answers, defendants' experts opined that Julien's autism diagnosis is "one more piece of evidence" that "is consistent with and supportive of [their] opinion that Julien Florez did not suffer from an acute injury at or around the time of labor and delivery." Defendants also filed a supplemental answer identifying Dr. Young as an expert witness. Plaintiff moved to strike the supplemental disclosures, arguing that defendants were "trying to inject this new issue into the case" and that the disclosures were untimely, since they were filed less than 60 days before trial. The trial court struck defendants' disclosures, finding that Rule 218(c) required that all discovery be completed no later than 60 days before trial.

¶ 55     However, we cannot ignore the fact that defendants' supplemental disclosures in response to Dr. Young's evaluation were untimely only because plaintiff filed Dr. Young's evaluation less than 60 days before trial. Plaintiff supplemented written discovery as required by the rules, but they did so 56 days before trial. Defendants' answers could not comply with Rule 218(c), even if they had been filed on the same day defendants received Dr. Young's report.

¶ 56     Nothing in the language of Rule 213(i) or Rule 218(c) indicates an intent to hold the 60-day limit above all other considerations. Rather, both rules explicitly state that they should be "liberally construed to do substantial justice" between the parties. Ill. S. Ct. R. 213(k) (eff. Jan. 1, 2018); R. 218(c) (eff. July 1, 2014). Plaintiff seeks "to enforce the letter of Rule 218(c) to his advantage without regard to its stated purpose," while ignoring his own actions that contributed to defendants' untimely filing. See *Frulla*, 2018 IL App (1st) 172329, ¶ 29. Strict enforcement of Rule 218(c)'s 60-day time limit in this case rendered Rule 213(i) meaningless, and as a result, defendants' experts had no way to offer their opinions on Dr. Young's report or reference Julien's autism diagnosis in support of their conclusions. Enforcement of Rule 218(c)'s 60-day time limit

here did not "do substantial justice between and among the parties." See Ill. S. Ct. R. 218(c) (eff. July 1, 2014).

¶ 57 Furthermore, the purpose of discovery rules "is to eliminate surprise and unfairness" and afford a fair opportunity to investigate. *People v. Sutton*, 349 Ill. App. 3d 608, 618-19 (2004). As our supreme court noted, "[d]iscovery is intended as, and should be, a cooperative undertaking by counsel and the parties, conducted largely without court intervention, for the purpose of ascertaining the merits of the case and thus promoting either a fair settlement or a fair trial." *Williams v. A.E. Staley Manufacturing Co.*, 83 Ill. 2d 559, 566 (1981). The process of discovery should not be conducted as a "tactical game." *Zagorski v. Allstate Insurance Co.*, 2016 IL App (5th) 140056, ¶ 39.

¶ 58 A mechanical application of Rule 218(c)'s 60-day deadline to defendants under these circumstances would encourage tactical gamesmanship. Dr. Young conducted her evaluation and prepared a written report on June 25, 2018. She discussed the results with Julien's family that day. Approximately one month later, plaintiff's counsel was given the report and they filed it as supplemental discovery on July 25, 2018. While we acknowledge that plaintiff's counsel tendered the report as soon as they received it, plaintiff gives no reason why they waited a month before presenting Dr. Young's report to their counsel. If plaintiff had supplemented their discovery after receiving Dr. Young's report on June 25, 2018, defendants would have had time to file their supplemental answers before the 60-day deadline. Instead, the one-month delay left defendants with no opportunity to respond within Rule 218(c)'s 60-day time limit.

¶ 59 After the trial court struck defendants' supplemental answers and their supplemental disclosure of Dr. Young as an expert witness as untimely, plaintiff moved to strike any reference

to autism at trial, arguing that "no witness would testify for either party that Julien is autistic," and "[n]one of plaintiffs' or defendants' experts have offered an opinion—neither in a discovery deposition nor Rule 213 disclosure—diagnosing Julien Florez with autism." The trial court granted the motion. Plaintiff's actions in filing Dr. Young's report less than 60 days before trial, filing motions to strike defendants' supplemental answers and disclosures as untimely, and after the trial court granted the motions, filing motion *in limine* No. 19 to strike any reference to Julien's autism at trial, prevented defendants from using the diagnosis as support for their opinions. We emphasize that, in making our determination, we take no position on the merits of plaintiff's case. We determine only that application of the discovery rules below did not serve their purpose, and condoning such conduct would encourage the same tactical gamesmanship the rules seek to avoid. *Sullivan*, 209 Ill. 2d at 109-10. Accordingly, we find that the trial court abused its discretion in striking the supplemental answers of defendants' experts pursuant to Rule 218(c).

¶ 60    Plaintiff argues, however, that it was defendants who engaged in improper gamesmanship by filing their untimely supplemental answers. Plaintiff insists that he had no intention to use the report with existing experts and defendants' late attempt to inject autism into the case was aimed at surprising plaintiff. Plaintiff maintains that Julien's autism-associated behaviors were "well-documented" in his medical records "long before the Young report," and defendants' experts could have incorporated autism in their answers well before the 60-day deadline.

¶ 61    We do not agree that Julien's autism was "well-documented" in the record. In their offers of proof, Dr. Hunter and Dr. Scher stated that the prior references to autism in the record did not constitute an actual diagnosis. While there were recommendations for formal testing, Julien did not undergo such testing, or obtain an actual diagnosis, until Dr. Young's evaluation. Absent Dr.

Young's report, Dr. Hunter stated that he "had no data that would suggest that [autism] had been identified or diagnosed." In her offer of proof, Aimee confirmed the lack of an earlier autism diagnosis. She stated that none of Julien's providers, teachers, or doctors in Florida had diagnosed him with autism. Although he had deficits associated with autism spectrum disorder, no physicians in Florida indicated that Julien may be autistic. In fact, Dr. Brosco told Aimee that Julien was not on the autism spectrum.

¶ 62    We also disagree that defendants filed the supplemental disclosures in an attempt to surprise plaintiff shortly before trial. As discussed above, plaintiff filed Dr. Young's report less than 60 days before trial. When defendants received the documents showing a professional diagnosis of autism spectrum disorder for the first time, they filed their experts' supplemental answers two weeks later, on August 9, 2018. Their supplemental answers did not disclose a completely new theory of causation that would have surprised plaintiff. Rather, defendants experts would opine that the diagnosis is "consistent with and supportive of [their] opinion that Julien Florez did not suffer from an acute injury at or around the time of labor and delivery." We adhere to our holding that the trial court should have allowed defendants to file their supplemental answers pursuant to Rule 213(i).

¶ 63    Errors in the exclusion of expert testimony warrant a new trial if they are "serious and prejudicial." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006); see also *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 75 (a new trial is warranted if the Rule 213 violation deprived the party of a fair trial, and that party demonstrates resulting prejudice). The trial court's denial of a motion for a new trial is reviewed under an abuse of discretion standard. *Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 39.

¶ 64 "In any negligence action, the plaintiff bears the burden of proving not only duty and breach of duty, but also that defendant proximately caused plaintiff's injury." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 93 (1995). Although the burden is on plaintiff to show proximate cause, if defendants have "evidence that negates causation" they "should [be able to] show it." *Id.* at 93-94.

¶ 65 Here, the critical issue before the jury was whether Julien's brain injury was proximately caused by defendants at or near the time of his birth or by other factors that have no connection to the circumstances of his birth. This was a vigorously contested case, with knowledgeable experts on one side giving scientific testimony that conflicted with the opinions of knowledgeable experts on the other side. Defendants' experts testified in their offers of proof that a diagnosis of autism, a brain disorder, would have supported their opinion that Julien suffered from chronic uteroplacental oxygen insufficiency, resulting in brain injury before birth. Dr. Hunter would testify that the autism diagnosis "provides a much stronger understanding of *** [Julien's] neurodevelopmental profile." Specifically, he would find that Julien's language deficits do not reflect an intellectual disability; rather, they reflect "a neurodevelopmental disorder that affects language."

¶ 66 According to defendants' experts, an autism diagnosis provides "one more piece of evidence" in support of their theory that Julien's brain damage was caused by a chronic condition and not by the circumstances of his birth. As such, Julien's diagnosis was material and relevant to the issue of causation. See *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 73-74 (2003) (stating that relevant evidence has the " 'tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence' ").

¶ 67    Plaintiff contends that a new trial is unwarranted because the exclusion of autism evidence did not prejudice defendants. He argues that the evidence at trial overwhelmingly favored plaintiff because "[t]he only logical and reasonable conclusion *** is that Julien sustained a significant neurologic injury at or near the time of delivery leaving him with profound and permanent deficits." We disagree. Evidence on the core issue of causation consisted primarily of expert testimony. The jury assigns weight to an expert's opinion in light of the expert's credentials and the factual basis of his or her opinion. *Snelson v. Kamm*, 204 Ill. 2d 1, 27 (2003). While the jury found in favor of plaintiff, thus giving more weight to the testimony of plaintiff's experts, we cannot say to what extent the jury discounted the testimony of defendants' experts. Both parties presented qualified and experienced experts, and we find nothing in the record that would cause the jury to completely disregard the testimony of defendants' experts.

¶ 68    The jury heard extensive expert testimony on both sides that led to conflicting opinions as to the cause of Julien's brain injury. Defendants' experts would have used Julien's autism diagnosis as further support for their opinion that his brain injury resulted from a chronic condition, in a case where both sides presented ample medical evidence for their positions. It was the jury's function to resolve the conflicting expert opinions and determine the cause of Julien's brain injury (*Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 64), and it was deprived of relevant evidence in making those determinations.

¶ 69    Exclusion of Julien's autism diagnosis also prejudiced defendants in the jury's assessment of damages. Defendants are only liable for the portion of damages resulting from injuries caused by them. *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 58 (2000). Therefore, even if the jury had found that autism had nothing to do with the brain injury caused by defendants, autism may still

be relevant to the question of damages. Autism spectrum disorder may be relevant to, among other things, Julien's speech and language deficits, his need for therapy, his schooling requirements, and his future employment prospects. Damages calculations included the costs of therapy and schooling and the loss of future earnings, but defendants were prevented from establishing whether Julien's autism diagnosis would reduce their damages. Under these facts, we find that exclusion of Julien's autism diagnosis deprived the jury of relevant evidence on the issues of causation and damages and that defendants were prejudiced as a result.

¶ 70    Due to our findings above, we need not address plaintiff's argument that defendants were required to seek leave of court pursuant to Illinois Supreme Court Rule 183 (eff. Feb. 16, 2011) before filing their untimely answers or defendants' argument that opposing counsel's remarks during closing argument constituted reversible error.

¶ 71                                    IV. CONCLUSION

¶ 72    For the foregoing reasons, we reverse the judgment entered against defendants and remand for a new trial.

¶ 73    Reversed and remanded.

**No. 1-19-0465**

| | |
|---|---|
| **Cite as:** | *Florez v. Northshore University Healthsystem d/b/a Evanston Hospital*, 2020 IL App (1st) 190465 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2014-L-13348; the Hon. Kay M. Hanlon and the Hon. Thomas More Donnelly, Judges, presiding. |
| **Attorneys for Appellant:** | J. Timothy Eaton and Jonathan B. Amarilio, of Taft Stettinius & Hollister LLP, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Patrick A. Salvi, II, Matthew L. Williams, Brian L. Salvi and Heidi L. Wickstrom, of Salvi, Schostok & Pritchard P.C., of Chicago, for appellee.<br><br>Robert G. Black, of Law Office of Robert G. Black, P.C., of Naperville, IL, for appellee. |