Third Division 

June 23, 2004 

No. 1-02-1280 

THE PEOPLE OF THE STATE ) Appeal from the

OF ILLINOIS, ) Circuit Court of

) Cook County 

Plaintiff-Appellee ) 

)

v. ) No. 98 CR 15711 

) 

DARRYL SUTTON,                    ) Honorable 

) Francis X. Golniewicz, Jr.

 Defendant-Appellant. ) Judge Presiding.

JUSTICE HALL delivered the opinion of the court:

On February 22, 2002, following a jury trial, defendant, Darryl Sutton, was convicted of seven counts of murder for the shooting death of Monica Rinaldi.  He was sentenced to four 100-year extended-term prison sentences and three natural life sentences.  Defendant directly appeals his conviction and sentences.

Defendant raises a number of issues on appeal.  However, based on our disposition of the case, we need only address two issues: (1) whether the trial court erred by allowing the admission of sole eyewitness David Janik's hypnotically enhanced testimony; and (2) whether the trial court erred by precluding defendant from independently retesting the deoxyribonucleic acid (DNA) evidence recovered in this case.  For the reasons that follow, we reverse and remand for a new trial.

BACKGROUND

Just after midnight on February 14, 1991, police responded to the call of a man ringing the doorbells of houses located on the 4000 block of Forest Avenue in Brookfield, Illinois.  Upon their arrival, police found David Janik staggering and bleeding.  Janik told police that he had been shot and robbed, and that his girlfriend had also been shot.  Police discovered Janik's girlfriend, Monica Rinaldi, lying across the backseat of her car, which was parked in a nearby alley.  Rinaldi was unclothed and had sustained a fatal gunshot wound to her head.

Officer Timothy Moroney rode with Janik in an ambulance to the hospital.  During the ride to the hospital, Janik allegedly gave the officer a brief account of events leading up to the shootings along with a general description of the assailant.  At the time of trial, however, Janik had no memory of his conversation with Officer Moroney.  The trial court permitted the officer to give testimony regarding Janik's out-of-court version of events under the spontaneous declaration or excited utterance exception to the hearsay rule.

According to Officer Moroney, Janik stated that he and Rinaldi were parked in a parking lot and were kissing, when a black man got into the car on the driver's side, forcing both of them over to the passenger side.  Janik described the black man as being about 30 to 35 years of age, with a moustache, wearing a dark coat and hat.  After entering the vehicle, the assailant drove off, eventually stopping near a pet store called Archer Puppies, whereupon he forced Janik to get inside the trunk of the Ford Escort.

According to the officer, Janik stated that after they drove for an unknown length of time, the car stopped again and after a while he heard gunshots from inside the car.  Shortly thereafter, the assailant opened the vehicle's trunk and shot Janik in the head.  The offender then ran through an alley in a westerly direction.  Janik stated that he eventually opened the trunk's hatchback and exited the vehicle through the driver's side door.

At the hospital, it was discovered that the bullet Janik was shot with traveled through his left temporal region, behind the orbit, maxilla, and the posterior part of the pharynx, before lodging in the upper right shoulder. Xrays, CT scans, and exploratory surgery revealed that Janik sustained no cranial penetration and suffered no major vascular injuries.  He was neurologically intact.  However, it was determined that Janik had suffered amnesia regarding the offense.  Janik's hospital chart revealed that he could not remember anything from the time he left work on February 13, 1991, to the time he woke up in the hospital, and initially he could not remember what day or year it was.

During his brief stay at the hospital, Janik spoke with family, friends, doctors and police officers.  Janik testified that while he was at the hospital he had no independent recollection of the offense but learned some of the details and circumstances of the offense from family and friends.  Janik was released from the hospital after five or six days.  Shortly after his release, Janik viewed police mug books but was unable to identify his assailant from the photographs.

In an effort to regain his memory of the offense and identify the assailant, Janik saw psychologist Dr. Steven I. Ries.  Records indicate that Janik saw the doctor from March 1991 to December 1991.  During the course of therapy, Janik underwent hypnosis on more than one occasion, but he could not recall the exact number of times he was hypnotized.  Janik also underwent other types of therapies such as guided imaging and dream interpretation.  Dr. Ries' notes reveal that during one therapy session Janik remarked that his assailant had "Mexican" like features.

At trial, conflicting versions of events were given regarding the time period at which a composite sketch of the assailant was made.  Officer Michael Manescalchi testified that Janik assisted a police sketch artist in preparing a composite sketch of the assailant on February 28, 1991.  Janik, however, testified that by May 11, 1991, he still could not visualize his assailant’s face.

Janik explained that his memory came back "in bits and pieces."  He testified that after one particular therapy session, he regained memory of what his assailant looked like and afterwards enlisted the services of an artist friend to draw a composite sketch of the assailant.

On September 6, 1991, after several months of therapy, Janik allegedly provided Officer Manescalchi with a more detailed and somewhat different description of the assailant and offense than he had previously given police.  At trial, however, Janik was unable to recall what he specifically told Officer Manescalchi during their conversation.

According to Officer Manescalchi, Janik described the assailant as a black male, approximately 5 feet 11 inches in height, weighing about 175 pounds.  Janik stated that the assailant had medium skin, black and neat short cut hair, and a mustache.  The officer testified that Janik also told him that the assailant wore a caramel colored leather driving hat and matching leather jacket. 

According to the officer, Janik further related that the attacker held his gun in his left hand and that after he entered the car, he turned on the windshield wipers and kept checking the mirrors.  Janik said that he complied with the assailant's request to hand over his wallet.  The assailant drove right and then left on Burlington, stopping at Burlington and Prairie, where he looked into the wallet.  The offender put the wallet on his lap and turned left on Prairie to Ogden, stopping at a red light.

Janik said that when he looked at the assailant, the assailant pulled up his collar.  The car proceeded southbound on Prairie, whereupon the attacker stated, "if you ID me, I will kill you."  The car eventually stopped in an alley where the attacker ordered Janik to get out of the car and into the vehicle's trunk.  Janik stated that he was shot as he put one foot in the trunk.  He then heard mumbling and someone moving around in the car.  The car was shaking and Janik started screaming and kicking the car's backseat whereupon the assailant yelled at Janik to be quiet.  When the car stopped shaking, Janik heard a gunshot and smelled gunpowder.  Janik then heard the driver's side door open and close.  The offender yelled at Janik through the trunk, "I didn't want to shoot you but if you ID me, I will [kill] you."  Janik eventually exited the vehicle and began banging on the doors of nearby homes.

Michael Podlecki, a forensic scientist with the Illinois State Police Crime Laboratory, testified that he analyzed biological evidence in this case.  His tests revealed that Rinaldi had type O blood and was a nonsecretor
(footnote: 1), and that Janik had type AB blood
(footnote: 2) and was a secretor.  PGM enzyme genetic marker tests revealed that Rinaldi was a PGM type 1 plus and that Janik was PGM type 1 plus, 2 plus.

Podlecki also received vaginal and rectal swabs and smears from Rinaldi as well as pieces of stained fabric from the car’s backseat.  All of these pieces of evidence contained seminal material on them.  Tests on the seminal material revealed that it came from an individual with type O blood who was a secretor.

After Podlecki tested the vaginal and rectal swabs, he asked a coworker for a stain card containing defendant's blood sample.  Analysis of the stain card revealed that defendant had type O blood and was a secretor.  A PGM enzyme genetic marker test revealed that defendant was a PGM type 1 plus, 2 plus.  Podlecki determined that the seminal material found on the vaginal and rectal swabs could have originated from defendant or from any male secreting ABO type H substance.  Podlecki testified that the PGM enzyme genetic marker test of the vaginal swab was inconclusive and the rectal swab did not match defendant, but added that the PGM activity could have come from Rinaldi’s vaginal or rectal secretions.

Podlecki testified that when he conducted his tests in 1991 and 1993, DNA analysis at the Illinois State Police Crime Laboratory was in its infancy.  He stated that he kept the biological evidence secured in cold storage at the lab until the time arrived when it could be submitted for DNA analysis.  Podlecki stated, "I knew the technology was coming, it was just a matter of time before [the samples] could be submitted for DNA [testing] to exclude or include the Defendant."

Several years later, the Illinois State Police Bureau of Forensic Sciences established a DNA data bank.  Defendant's DNA profile was stored in this data bank.  On April 10, 1997, Podlecki sent Rinaldi’s vaginal and rectal swabs as well as a swatch of stained fabric from the car’s backseat to the crime lab for forensic DNA analysis.

Daniel Otto, a former forensic biologist at the Illinois State Police Crime Lab, testified that he analyzed the samples using a DNA profiling technology referred to as restriction fragment length polymorphism or RFLP.
(footnote: 3)  His analysis revealed two different DNA profiles on the vaginal and rectal swabs and on the stained swatch of fabric.  All of the samples contained the same two different DNA profiles.  One of the DNA profiles matched Rinaldi while the second DNA profile matched neither Rinaldi nor Janik.

Otto took the unknown DNA profile and entered it into the DNA data bank.  The data bank indicated that the unknown DNA profile found on the three samples was consistent with having originated from defendant.  Pursuant to a court order, Otto obtained samples of defendant's blood to conduct a confirmatory DNA analysis between the unknown DNA and defendant's DNA.  The confirmatory test indicated that the unknown DNA was consistent with having originated from defendant.

On December 4, 1997, Otto prepared a report concluding that semen found on the three samples was consistent with having originated from the defendant.  The report stated that the DNA profile identified on the three samples would be expected to occur in 1 in 1.8 billion African-Americans, 1 in 650 million Caucasians, and 1 in 430 Million Hispanics.  At trial, Otto testified that these numbers indicated a strong "match."  On May 21, 1998, Janik viewed a lineup and identified defendant as the individual who shot him and Rinaldi.

ANALYSIS

I. Hypnotically Enhanced Testimony

Defendant first contends that his rights to due process of law, present a defense, and confront witnesses under the Illinois and United States Constitutions were violated when the trial court improperly allowed the admission of Janik's hypnotically enhanced testimony. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §2.  We agree.

Prior to trial, defense counsel brought a motion to preclude admission of Janik's hypnotically enhanced testimony on the ground that this testimony was the product of hypnosis and other unreliable memory-retrieval techniques.  At the hearing on the motion, the prosecutor conceded that she did not know exactly what 
part of Janik's memory may have been enhanced by the hypnosis, but she went on to argue that his testimony should be admitted nonetheless since there was no proof that the testimony was the product of hypnosis.

After hearing arguments on the matter, the trial court denied defendant's motion, finding that it was not clear whether Janik's memory was restored through hypnosis or by the mere passage of time.  The trial court concluded that the reliability of Janik's hypnotically enhanced testimony was a matter for the jury to decide.

On January 14, 2002, defense counsel brought a renewed pretrial motion to preclude the admission of Janik's hypnotically enhanced testimony arguing that the State should be required to produce Dr. Ries, the doctor who hypnotized Janik, in order to lay a foundation for the admission of this testimony and to provide expert testimony regarding the possible effects of hypnosis on a witness's testimony.  The trial court denied this motion as well, arguing that expert testimony on this matter would invade the province of the jury as it related to Janik's credibility and that the failure of the State to lay a foundation for Janik's hypnotically enhanced testimony was a matter for cross-examination.

In criminal trials, the determination of whether evidence is admissible is within the sound discretion of the trial court, whose rulings will not be reversed absent a clear abuse of that discretion. 
People v. Ward
, 101 Ill. 2d 443, 455-56, 463 N.E.2d 696 (1984).  In the present case, we find that the trial court erred in its analysis regarding the admissibility of Janik’s hypnotically enhanced testimony.

In 
People v. Zayas
, 131 Ill. 2d 284, 295, 546 N.E.2d 513 (1989), our supreme court ruled that the hypnotically enhanced testimony of anyone other than a criminal defendant is 
per se
 inadmissible.  A witness may testify to his prehypnotic recall (
People v. Wilson
, 116 Ill. 2d 29, 48-49, 506 N.E.2d 571 (1987)), but the proponent of such evidence bears the burden of establishing that the testimony is based solely upon the witness's independent, prehypnotic recollection. 
Zayas
, 131 Ill. 2d at 297.

The State contends that, even though Janik underwent hypnosis, his posthypnotic testimony regarding the offense and his identification of defendant was admissible because the record does not demonstrate that this testimony was influenced by hypnosis.  The State's contention is meritless.  The extent of detail in Janik’s posthypnotic statement compared to the relative absence of detail in his prehypnotic statement clearly indicate that his posthypnotic statement was influenced by hypnosis.

The record shows that on February 14, 1991, as Janik was being transported to the hospital for treatment of his gunshot wound, he gave responding officers a general description of the assailant, describing the attacker as a black man of about 30 to 35 years of age, with a moustache, wearing a dark coat and hat.  At the hospital, doctors determined that Janik had suffered complete amnesia regarding the offense.

Shortly thereafter, from March 1991 to December 1991, Janik underwent periodic sessions of hypnosis and other memory-retrieval therapies such as guided imaging and dream interpretation in an effort to identify the assailant and regain memory of the offense.  Despite undergoing these various therapies, by May 11, 1991, Janik still could not visualize his assailant’s face.  Janik testified that over the course of his therapy, his memory came back "in bits and pieces."

On September 6, 1991, approximately six months into his therapy, Janik allegedly provided Officer Manescalchi with a detailed description of his assailant and the offense.  For example, rather than merely describing the assailant as a black man of about 30 to 35 years of age, with a moustache, Janik now described the offender as a black male, approximately 5 feet 11 inches in height, weighing 175 pounds, with a mustache, medium skin, and black hair that was cut very short and neat; and rather than merely describing the assailant as wearing a dark coat and hat, the attacker was now described as having worn a caramel-colored leather driving hat and matching leather jacket.

Moreover, the record indicates that Janik’s posthypnotic statement contained a somewhat different version of events regarding the offense than his prehypnotic statement contained.  For example, the record shows that Janik initially told Officer Moroney that he was shot after he was forced into the car's trunk and the car had traveled for an unknown length of time.  However, in his posthypnotic statement Janik stated that he was shot as he put one foot in the trunk.

In addition, Janik's posthypnotic statement was more detailed than his pre-hypnotic statement.  In the posthypnotic statement, unlike the prehypnotic statement, Janik describes the specific route the assailant took after he hijacked the vehicle.  Moreover, Janik describes how after he heard mumbling sounds and felt the car shaking, he started screaming and kicking the car's backseat; he also states that he smelled gunpowder after hearing the gunshot from inside the vehicle.

Such detail leads us to conclude that Janik's posthypnotic testimony was influenced by hypnosis, especially in light of Janik's testimony explaining that over the course of his therapy, his memory came back "in bits and pieces," and that after he stopped the therapy he did not regain any more memory of the offense.

The trial court's error in allowing the admission of Janik's hypnotically enhanced testimony was compounded by the court's subsequent error in precluding defendant from presenting expert testimony regarding the possible effects of hypnosis and other memory-retrieval techniques on a witness's ability to accurately recall events.  We have found no Illinois case holding that a criminal defendant is entitled to present such expert testimony under the factual circumstances in this case.  However, this is not surprising, considering our supreme court's decision in 
Zayas,
 holding that since the relevant scientific community has not generally accepted hypnosis as an accurate or reliable method of restoring a witness's memory, the hypnotically enhanced testimony of anyone other than a defendant is 
per se
 inadmissible. 
Zayas
, 131 Ill. 2d at 295.

In general, before an expert is permitted to render an opinion concerning a novel scientific technique, that technique must be generally accepted in the relevant scientific community. See 
People v. Baynes
, 88 Ill. 2d 225, 241, 430 N.E.2d 1070 (1981); 
People v. Enis
, 139 Ill. 2d 264, 288, 564 N.E.2d 1155 (1990).  Hypnosis has not gained such general acceptance.

However, where a previously hypnotized witness satisfies the burden of establishing that his testimony is based solely upon his independent, prehypnotic recall, and he is subsequently permitted to testify to his prehypnotic recollection, a defendant is permitted to offer expert testimony regarding the possible effects of hypnosis on a witness's recollection. 
Wilson
, 116 Ill. 2d at 46-49.  In light of 
Wilson
 and the trial court's finding that it could not determine whether Janik's recall was enhanced by hypnosis or the mere passage of time, it was inconsistent and improper for the court to allow admission of Janik's posthypnotic testimony, which was clearly improper under 
Zayas
, and at the same time preclude defendant from presenting expert testimony on the issue.

In this case, expert testimony was the only means available to defendant to educate jurors as to the effects of hypnosis on the reliability of a witness's testimony.  Janik was the only eyewitness to the offense and his testimony was based exclusively on his memory of the assault, which in turn was restored through his therapy sessions.  Therefore, expert testimony regarding the known effects of memory-restoration techniques, such as hypnosis, on the reliability of a witness's testimony, was indispensable to defendant's defense to the charged crime.

Moreover, in light of our finding regarding the DNA evidence issue, which follows, we reject the State's assertion that even if the trial court erred by allowing the admission of Janik's hypnotically enhanced testimony or precluding defendant from presenting expert testimony on the issue, such error was harmless in light of the DNA evidence.  In order for a trial error to be considered harmless, there must be no reasonable probability that the outcome of the trial would have been different if the error had not occurred. 
People v. Flournoy
, 336 Ill. App. 3d 739, 746, 784 N.E.2d 353 (2002).  

II. Discovery Sanction

Defendant next argues that his constitutional rights to a fair trial, confront witnesses, and present a defense were violated when, as a discovery sanction, the trial court denied his pretrial discovery request to independently retest the DNA evidence recovered in this case.  We agree.

Supreme Court Rule 415(g) (134 Ill. 2d R. 415(g)), authorizes a trial court to impose sanctions for violations of a discovery rule or order in felony cases. 
People v. Forsythe
, 84 Ill. App. 3d 643, 645, 406 N.E.2d 58 (1980); 
People v. Houser
, 305 Ill. App. 3d 384, 390, 712 N.E.2d 355 (1999).  The rule provides in relevant part as follows:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." 134 Ill. 2d R. 415(g).

Denying a defendant's pretrial discovery request to independently retest DNA evidence is not a specified sanction under Rule 415(g), and therefore such a sanction is proper only if it is "just under the circumstances." See 
Forsythe
, 84 Ill. App. 3d at 645.  We find that the imposition of such a sanction was not just under the circumstances in this case.

The purpose of the discovery rules is to eliminate surprise and unfairness and to afford an opportunity to investigate.
 People v. Hawkins
, 235 Ill. App. 3d 39, 41, 600 N.E.2d 923 (1992).  Sanctions are designed to accomplish this purpose. 
Hawkins
, 235 Ill. App. 3d at 41.  A trial court's imposition of a discovery sanction will not be reversed on appeal absent an abuse of discretion. 
People v. Elworthy
, 214 Ill. App. 3d 914, 574 N.E.2d 727 (1991).  However, sanctions should not encroach on a party's right to a fair trial. 
Houser
, 305 Ill. App. 3d at 390.  "[S]anctions which are imposed should be fashioned so as to meet the circumstances of the particular case and with the ultimate object of compelling compliance, not the punishment of a party for the oversight or errors of his attorney." 
People v. Anderson
, 80 Ill. App. 3d 1018, 1019, 400 N.E.2d 675 (1980); see also 
People v. Scott
, 339 Ill. App. 3d 565, 572, 791 N.E.2d 89 (2003).

The record shows that, based in part on DNA evidence recovered in this case, defendant was indicted for the murder of Rinaldi on June 10, 1998.  On October 1, 1999, original defense counsel informed the initial trial judge, Judge Frank DeBoni, that his experts had completed their analysis of the DNA evidence and that he did not intend to list the experts in discovery.  In February 2000, Judge DeBoni was replaced by Judge Frances X. Golniewicz, Jr.

On September 19, 2000, the trial court heard argument on original defense counsel's motion to independently retest the DNA evidence.  The State did not object to the motion.  In response to the trial court's inquiry as to why counsel had not earlier filed a motion to retest, counsel stated that the initial decision not to retest was made for strategic and tactical reasons.  After rejecting defense counsel's explanation, the trial court denied the motion to retest on the ground that it was not timely filed.

We find that, under the circumstances in this case, the trial court's imposed sanction of denying original defense counsel's motion to independently retest the DNA evidence on timeliness grounds was an abuse of discretion.  First, the State was not prejudiced by counsel's delay in bringing the motion and in fact did not object to the motion.  At the time the motion to retest was filed, the case was still in discovery, no trial date had been set, no allegations had been made that defendant failed to comply with any discovery requests, and importantly, there was no indication that the trial court was faced with the practical problem as to the quantity of DNA samples available for retesting. See, 
e.g.
, W. Thompson, 
Accepting Lower Standards: The National Research Council's Second Report on Forensic DNA Evidence
, 37 Jurimetrics J. 405, 415 (1997) (noting that in many cases retesting cannot be done because critical samples are exhausted or consumed during the initial analysis).

Second, we cannot say that counsel's delay in bringing the motion to retest was unreasonable. See,
 e.g.
, P. Giannelli, 
Criminal Discovery, Scientific Evidence, and DNA
, 44 Vand. L. Rev. 791, 819 (1991) ("[R]etesting comes with a price tag.  The prosecution could introduce evidence that samples had been turned over to the defense with the opportunity for defense retesting and then comment to the jury on the defense's failure to introduce the test results"); 
37 Jurimetrics J. at 416 ("A defense attorney may avoid a retest when one is needed because he or she suspects (falsely) that the defendant is guilty or because the defendant opposes a retest.  An innocent defendant will not necessarily want a retest.  Having already been implicated falsely, an innocent defendant may doubt the test's accuracy, distrust the integrity of the testing process, or have other reasons for preferring an ambiguous result").

Third, a defendant's right to independently test tangible evidence is not waived on timeliness grounds if such waiver would deny defendant his constitutional right to a fair and impartial trial. 
People v. Madison
, 264 Ill. App. 3d 481, 494-96, 637 N.E.2d 1074 (1994).  A defendant's right to retest is implied from Supreme Court Rule 412 (134 Ill.2d R. 412). See, 
e.g.
, 44 Vand. L. Rev. at 816 ("Discovery should include the right to test and retest evidence previously analyzed by prosecution experts.  This right is recognized explicitly in the discovery rules of some jurisdictions.  In other jurisdictions, the right to retest is implied from discovery rules that permit the inspection of tangible evidence").

In Illinois, a defendant has a constitutional right to conduct his own tests on physical evidence. 
People v. Peeples
, 155 Ill. 2d 422, 477, 616 N.E.2d 294 (1993), citing 
People v. Garza
, 92 Ill. App. 3d 723, 734, 415 N.E.2d 1328 (1981).  Supreme Court Rule 412(a)(v) requires the State, upon written motion of defense counsel in advance of trial, to disclose to counsel, 
inter alia
, any tangible objects the prosecutor intends to use at trial or that were obtained from or belong to the defendant. 
Peeples
, 155 Ill. 2d at 477.  The rule further provides that the State may perform this obligation in any manner mutually agreeable to itself and defense counsel or by notifying defense counsel that the material may be tested and making available to counsel such material as well as suitable facilities or other arrangements for the inspection and testing of that material. 134 Ill. 2d R. 412(e)(i)(ii); 
Peeples
, 155 Ill. 2d at 477.  In addition, the committee comments to Supreme Court Rule 412(e) provide in relevant part as follows:

"Access to material by a defense expert must be permitted, sufficient to allow him to reach conclusions regarding the State's examining or testing techniques and results.  Where feasible defense counsel should have the opportunity to have a test made by his chosen expert, either in the State's laboratory or in his own laboratory using a sufficient sample." 134 Ill. 2d R. 412, Committee Comments, at 349.

In this case, the trial court's ruling denying defendant's motion to independently retest the DNA evidence on timeliness grounds constituted a violation of Supreme Court Rule 412.  In this regard, we note that the National Research Council's second report on forensic DNA evidence has emphasized that allowing a criminal defendant to retest DNA evidence is one of the most effective means of identifying and correcting errors that might have occurred during the initial analysis. National Research Council, Committee on DNA Forensic Science: An Update, The Evaluation of Forensic DNA Evidence 87 (1996).

Moreover, we find that the trial court's erroneous ruling prejudiced the defendant where evidence was presented indicating that the DNA test results contained possible discrepancies which additional tests could likely resolve.  For example, the State's expert witness acknowledged on cross-examination that a particular location on the DNA extracted from the vaginal swab contained one band and the faint shadow of a possible second band, while at this same location defendant's DNA contained two distinct bands.  In response to defense counsel's question as to whether the discrepancy in the number of bands excluded defendant as a possible source of the DNA, the expert stated that newer methods of DNA testing existed such as STR (short tandem repeats) and PCR (polymerase chain reaction) that were probably sophisticated enough to resolve the discrepancy.

At the time of trial, both testing methods were in use in Illinois laboratories but neither test was used to analyze the DNA evidence recovered in this case.  We also recognize that other than David Janik's erroneously admitted hypnotically induced testimony, the only other evidence connecting defendant to the offense was the DNA evidence.  On this record, we find that the trial court's imposed discovery sanction of denying original defense counsel's motion to independently retest the DNA evidence on timeliness grounds denied defendant his constitutional rights to a fair trial, confront witnesses, and present a defense.

Since this cause must be remanded for a new trial, we find it unnecessary to consider the remaining issues raised by the defendant.  We note, however, that the State presented sufficient evidence of defendant's guilt to protect defendant's constitutional right against double jeopardy. See 
People v. Taylor
, 76 Ill. 2d 289, 309-10, 391 N.E.2d 366 (1979).  This determination is not binding on retrial, and we do not express an opinion concerning defendant's guilt or innocence.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

HOFFMAN, P.J., and KARNEZIS, J., concur.

FOOTNOTES
1: See P. Giannelli & E. Imwinkelried, Scientific Evidence § 17-8 at 578 (1986) (stating that a secretor is an individual whose genetic markers are secreted into body fluids other than blood, such as, for example, saliva and semen).   

2: Blood is typed by identifying the ABO-blood-group substance in the blood cells and by identifying the antibodies that are present in the liquid portion of the blood; the ABO-blood-group system is one example of a genetic marker -- a substance that is present in everyone but in different forms. 
People v. Mehlberg
, 249 Ill. App. 3d 499, 508, 618 N.E.2d 1168 (1993).  Another genetic marker is phosphoglucomutase or PGM, which is an enzyme present in blood, vaginal secretions, semen and other body fluids. 
Mehlberg
, 249 Ill. App. 3d at 508.  There are 4 common blood types, A, B, AB, and O, and there are 10 different types of PGM, thereby permitting subtyping with regard to blood type and PGM.      

   

3: Forensic DNA typing using RFLP analysis involves the following steps:

(1) DNA is extracted from the specimen and "washed" with an organic solvent; (2) the extracted DNA chain is then mixed with a restriction enzyme that cuts the DNA into fragments at specific sites; (3) the DNA is placed in a gel to which an electric current is applied, causing separation of the fragments into bands according to their length; (4) the DNA bands are transferred to a nylon membrane while retaining the same position they previously occupied on the gel.  The double-stranded bands are treated with a chemical that causes them to separate into single strands; (5) genetic probes (DNA clones) are applied, which bind to a specific, complementary DNA sequence on the membrane.  The excess probe is washed off; (6) the membrane is exposed to an x-ray film and developed so that the DNA banding patterns and their lengths can be seen; and (7) the resulting autoradiograph is interpreted by comparing the DNA print to another DNA sample to determine if they match based on band length. See 
State v. Schwartz
, 447 N.W.2d 422, 425 (Minn. 1989).