2020 IL App (1st) 180510-U
No. 1-18-0510
December 31, 2020
Modified Upon Denial of Rehearing May 24, 2021

FIRST DIVISION

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15 CR 5773 |
| | ) | |
| DOMINIQUE PARKMAN, | ) | The Honorable |
| | ) | Charles P. Burns |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE WALKER delivered the judgment of the court.
Justices Pierce and Coghlan concurred in the judgment.

**ORDER**

*Held*: The State proved beyond a reasonable doubt that Parkman was not justified in his use of deadly force in self-defense. The trial court did not violate Parkman's constitutional right to present a defense when it barred Parkman from testifying about a prior incident with the victim after Parkman failed to disclose the details of the incident prior to trial.

¶ 1    Defendant, Dominique Parkman, was charged by indictment with the first-degree murder of Jujuan Lewis. Following a jury trial, Parkman was found guilty of second-degree murder and sentenced to 14 years' imprisonment. At trial, Parkman asserted that he acted in justified

self-defense when he shot Lewis. The trial court barred Parkman from testifying about a prior incident where Lewis allegedly possessed a gun and threatened Parkman. Parkman appeals arguing that the State failed to prove beyond a reasonable doubt that he was not justified in his use of deadly force and that the trial court violated his constitutional right to present a defense. For the following reasons, we affirm.

¶ 2                                              BACKGROUND

¶ 3        On May 28, 2013, Lewis drove around the Morgan Park and Beverly neighborhoods of Chicago with John Williams, Jeremy Watkins, and Lewis's son, Jordan. Lewis pulled out a .45-caliber handgun from under a front seat to show the others. He later asked Williams to take over driving. Williams drove south on Vincennes Avenue, past Parkman, Dontae Frazier, and Anthony Leftridge, who stood on the sidewalk. Williams made a U-turn and parked across the street. Lewis and his friends exited the car to confront Parkman and his friends. An altercation ensued where Parkman shot and killed Lewis, Watkins fired the .45 multiple times, and everyone fled the scene. The State charged Parkman with first-degree murder.

¶ 4        Prior to trial, the State filed a motion for discovery requesting notice of any affirmative defenses, a list of defense witnesses with their written, recorded, or summarized statements, and notice of any subsequently discovered evidence subject to disclosure. The defense stated Parkman would claim self-defense and defense of others. The defense noted that Parkman might testify and, citing *People v. Lynch*, 104 Ill. 2d 194 (1984), listed possible other witnesses associated with prior incidents in which Lewis acted violently. Defense counsel attached relevant reports and documents for each witness. However, defense made no mention of Lewis

threatening Parkman with a firearm on a prior occasion. The defense filed a supplemental answer and again did not mention Lewis threatening Parkman on a prior occasion.

¶ 5    In the State's written discovery answer, it asserted that it "may or may not" rely on Parkman's prior actions in another case, *People v. Cinque Lee*, for proof of knowledge, intent, motive, scheme, or design. At multiple pre-trial court dates, the parties referred to related cases possibly relevant to Parkman's alleged motive and discussed how much of that evidence might be allowable at Parkman's trial. Defense counsel filed a motion in *limine*, which the State joined, to bar hearsay testimony about both the *Cinque Lee* case and any prior conflict between Lewis and Parkman.

¶ 6    The State filed a motion *in limine* to restrict Parkman's use of *Lynch* evidence. At the hearing on the motion, Parkman outlined the factual basis for Parkman's self-defense claim. However, Parkman did not mention Lewis threatening him on a prior occasion. The State responded that some ostensible *Lynch* material about Lewis's prior bad acts should be barred, and that at trial, Parkman should only introduce allowed *Lynch* evidence after adequately raising self-defense. Counsel for Parkman agreed she would not bring up *Lynch* material during opening statement or cross-examination of the State's witnesses. The trial court allowed most of the *Lynch* evidence about Lewis's prior violent acts witnessed by others and said it did not know "if there is going to be any testimony with regard to [what Parkman] knew" about Lewis's propensity for violence.

¶ 7    Before picking the jury, the trial court sought confirmation that Parkman was raising self-defense and asked the defense, "Which prong of *Lynch* or did I grant both prongs." The defense

responded, "Both," and noted that Parkman did not have personal knowledge about several of the prior *Lynch* incidents.

¶ 8    The case proceeded to a jury trial. Williams testified that around 2:00 p.m. on May 28, 2013, Lewis and Watkins picked him up from his aunt's house in a white Dodge Avenger he had seen Lewis drive before. Lewis drove, Watkins sat in the front passenger seat, and Williams sat in the back with Lewis's three-year-old son, Jordan. They drove around the Morgan Park, Beverly, and Blue Island neighborhoods on the south side of Chicago, eventually stopping to buy a snack for Jordan. While stopped, Lewis pulled a .45-caliber handgun out from under one of the front seats to show the others, and then put it back. Thereafter, Lewis and Williams switched seats because Lewis did not have a valid driver's license. Lewis sat in the front passenger seat, and Watkins sat in the back with Jordan.

¶ 9    Williams began to drive towards Vincennes Avenue, but there was no discussion about where they were going. While driving south on Vincennes, Williams drove past Parkman, Frazier, and Leftridge on the sidewalk. Williams had known each of them for several years and had "no problems" with any of them. Williams described his relationship with the three men as "cool." No one on the sidewalk threatened or yelled at anyone in the car. However, Williams initially testified that he saw one of the men on the sidewalk "reach like they had a firearm." He later testified that he did not remember if he saw someone "reach like they had a firearm" or if Lewis or Watkins said they did. Williams drove past without incident, but at the end of the block, the group decided to make a U-turn so they could "get out and talk to them."

¶ 10   Williams parked on the east side of the street, across from the others. Williams and Lewis exited the car without the handgun. Leftridge stood on the sidewalk a couple houses south of

4

Frazier and Parkman. Williams wanted to find out who reached for a gun but did not feel in danger. They walked towards Leftridge and talked to him. Leftridge lifted his shirt, but Williams did not see anything. Lewis questioned Leftridge, Frazier, and Parkman. On direct examination, Williams testified that Lewis's voice was loud, but he was not being aggressive. He further asserted that the encounter did not get heated or physical, and no one displayed a weapon as Lewis was posing questions to the group. Likewise, nobody made any physical contact with one another.

¶ 11 Williams testified that after less than a minute, he turned to walk back to the vehicle. As Williams turned, he saw Lewis turn also. He did not see Watkins, and he did not see Lewis approach Parkman or fight with him. As he turned, Williams believed he saw a firearm in Parkman's front waistband. He heard gunshots but did not see who was shooting or from where the shots were coming. Williams then ran to the vehicle. He pulled Jordan out of the backseat and fled into a nearby backyard. After he fled with Jordan, he could not see what was happening. When the shots stopped, Williams walked back to Vincennes Avenue.

¶ 12 Williams also testified that he saw Lewis lying on his stomach in the street, bleeding out of his mouth. Williams attempted to speak to Lewis, but Lewis did not respond. Williams and Jordan went to a nearby house, where they waited until police arrived. After speaking to the police, Williams identified Parkman, Leftridge, and Frazier in three separate photo arrays.

¶ 13 Frazier testified that at the time of trial he was on parole for a drug conviction, and a gun possession conviction. On May 28, 2013, he stood outside on Vincennes Avenue between 115th and 116th Streets, conversing with Leftridge and Parkman. Shortly after 3:00 p.m., Frazier observed Lewis and Williams in a white Dodge Avenger that came "flying up"

5

Vincennes Avenue. Williams was driving, Lewis sat in the front seat, and someone Frazier did not know sat in the backseat. The vehicle drove past Parkman, Leftridge, and Frazier. The vehicle drove to a stop sign at 117th Street and made a U-turn. Frazier and the others crossed from the east side to the west side of the street as Williams drove back towards them and parked.

¶ 14    Frazier also testified that Lewis, Williams, and the third man (Watkins) got out of the car, crossed the street, and approached Leftridge, who stood a house or two away from Frazier and Parkman. Frazier did not see Watkins directly threaten anyone with the gun, but he stood behind Lewis "enforcing whatever he was saying." Lewis and the others were aggressive and argued with Leftridge. Frazier heard Leftridge say, "I ain't never pull a gun out on you." Lewis and Williams did not have a gun, but Watkins had a chrome handgun at his side. At this point, Frazier did not see any party get physical with one another. Frazier approached and told them to leave. Williams and Watkins got back in the car. Lewis was still talking but started walking back to the car.

¶ 15    As Lewis began to walk back to the car, Parkman said something to Frazier. Lewis stopped and started walking back toward Parkman. Lewis and Parkman stood on the sidewalk exchanging words with one another. After they had words, Lewis and Parkman began grabbing each other. Frazier testified that Lewis started the altercation by swinging at, but missing, Parkman. Parkman then pulled out a gun and shot Lewis. Lewis grabbed his stomach, moved towards the car, and fell in the street as Parkman continued firing. Frazier testified that he heard shots from multiple guns but did not know where they came from. After the shooting stopped, Frazier and Leftridge ran south on Vincennes Avenue to Frazier's grandmother's house.

6

¶ 16      Frazier stated that he testified before the grand jury in March 2015 that after Lewis walked up to Parkman, Frazier thought they were about to shake hands, but they started grabbing each other, and Parkman pushed Lewis before shooting him in the stomach.

¶ 17      Chicago Police Department (CPD) detective Arthur Davis testified that he was assigned to investigate the matter and interviewed multiple individuals, including Frazier. The State played a video of that interview for the jury, during which Frazier referred to his conversation with Parkman the morning after the incident. Parkman stated he was lying low and that the police lacked evidence against him. Davis testified that Watkins was arrested for aggravated discharge of a firearm, and interrogated, but subsequently released without charges.

¶ 18      CPD forensic investigator Zbigniew Niewdach testified about his investigation of the crime scene located at 11648 S. Vincennes Avenue. Officer Niewdach's investigation revealed that two different guns were fired during the incident. Specifically, six 9-millimeter casings were recovered on the west side of the street, and eight .45-caliber casings were recovered from inside and outside the Dodge Avenger. He also recovered what appeared to be a fired 9-millimeter bullet on Lewis's pant leg.

¶ 19      Illinois State Police forensic scientist Marc Pomerance testified as a toolmark expert and explained that the 9-millimeter casings were all fired from Parkman's gun. Furthermore, he opined that seven of the .45-caliber casings were fired from the same gun, and the eighth could not be excluded as a match.

¶ 20      Gunshot residue evidence indicated that Williams might not have discharged a firearm with either hand. This evidence also showed that Lewis either personally discharged a firearm,

contacted a residue-related item, or had his right hand "in the environment of a discharged firearm." Gunshot residue could be deposited up to six feet from a fired gun.

¶ 21    Dr. Ponni Arunkumar testified that an autopsy was conducted on Lewis's body. Evidence from Lewis's autopsy showed that he had multiple skin abrasions on his arms and knee, which were consistent with a person falling. Lewis suffered gunshot wounds to his left chest, left knee, right shoulder, back, and left buttock, and graze wounds on his left elbow and right thigh. The gunshot wounds were consistent with Lewis standing up, falling, or lying down, and the shots appeared to have been fired from more than two feet away. The cause of death was determined to be multiple gunshot wounds, and the manner of death was homicide.

¶ 22    Parkman testified in his defense and proceeded on a theory of self-defense. Parkman testified that he had lived his entire life in the Beverly and Morgan Park neighborhoods of Chicago and was convicted of burglary in 2010. On May 28, 2013, at approximately 3:00 p.m., Parkman was hanging out near 116th and Vincennes with Frazier and Leftridge. Parkman was carrying a 9-millimeter handgun on his waist for protection. Parkman saw Lewis's white Dodge Avenger approach, with Williams and Lewis inside. Parkman had known Lewis for several years and "had been" friends with Lewis and Williams but had not seen Lewis for around a year.

¶ 23    When Parkman saw the vehicle, he was scared because he "felt like it was tension already." He was relieved when the vehicle drove past. However, the vehicle made a U-turn and drove back to Parkman and parked across from them on the east side of the street. Parkman testified that he never waved down the car or called out to its occupants and said he "just knew it was going to be trouble when it came around."

¶ 24     Lewis, Williams, and Watkins exited the car, came across the street, and walked towards Parkman. Lewis looked mad, and Watkins carried a gun with his finger on the trigger. Leftridge spoke up and walked towards them. Parkman stayed put, scared and nervous. Watkins raised the gun at Leftridge. Watkins then walked back to the far side of the car, still holding the gun. Williams and Lewis remained, and Lewis paced back and forth.

¶ 25     Lewis looked at Parkman and walked towards him. Parkman testified that as soon as Lewis got close enough, he swung at Parkman. Parkman stumbled back, pulled out his gun, and shot Lewis. Lewis moved towards Parkman and tried to grab him, and Parkman fired again. As Parkman shot, he heard other gunshots coming from in front of him.

¶ 26     Parkman stated that he was not sure if Lewis had a gun. Parkman ran from the shooting. He was confused and scared, and he did not call the police. He got rid of the gun, which police later recovered nearby. A couple of weeks later, Parkman observed that his house had been hit with multiple gunshots. Subsequently, Parkman left for Miami, where he resided with family. Parkman was arrested in February 2015.

¶ 27     During direct examination of Parkman, defense counsel sought to question Parkman about a July 26, 2012, incident wherein Lewis threatened him with a firearm. The State objected to introducing this evidence and, at a sidebar, stated it was "completely taken by surprise by this allegation." The State argued that Parkman's testimony should be barred because the defense did not bring it up before trial, and it "becomes far too prejudicial." The trial court questioned if this was a *Lynch* incident, to which defense counsel replied, "No." The defense asserted that information about the incident came from the State's own discovery; the State had not moved to bar evidence about the incident despite knowing about it; and the State listed Juanita Pittman,

9

a witness to the incident, as a potential witness. The defense further argued that it had properly raised self-defense in its discovery answer and was not required to disclose Parkman's testimony. The State responded that it possessed no specific information about Lewis possessing a gun during the prior incident, but that Cinque Lee tried to pass Lewis a gun, who refused to take it.

¶ 28    The trial court noted that self-defense is an affirmative defense, the specifics of which must be pled for the State to have an opportunity to address the defense. The trial court acknowledged that the testimony was relevant to Parkman's state of mind at the time of the shooting but viewed bringing it up for the first time at trial as an "ambush," "fundamentally unfair," and a "discovery violation." The trial court held that the evidence had not been disclosed, and it was fundamentally unfair for the defense to lay "in the weeds" and try to assert a self-defense claim with no specifics. The trial court barred the testimony, only allowing the defense to ask Parkman one yes-or-no question of whether, before May 2013, had he "ever seen [Lewis] with a gun." Parkman testified that he had previously seen Lewis with a gun.

¶ 29    Additionally, Parkman presented seven *Lynch* witnesses, who testified about other prior acts of violence by Lewis—including acts of domestic violence and an incident in which Lewis attacked and injured another man on a college campus by punching and kicking him.

¶ 30    During closing argument, the State argued Parkman was not justified in his use of deadly force. The defense argued that Parkman reasonably believed that his use of self-defense was necessary. Alternatively, Parkman claimed he believed that his force was necessary, even if that belief was unreasonable. The jury found Parkman guilty of second-degree murder.

¶ 31     After trial, defense counsel filed a motion to reconsider. In the motion, Parkman argued, *inter alia*, that the trial court erred by barring Parkman's testimony about the July 2012 incident between Lewis and Parkman. Defense counsel argued that she did not violate discovery rules by not disclosing the content of Parkman's testimony before trial because the State knew about the incident and had evidence it could have used in cross-examination or rebuttal. The State argued that the trial court properly barred the testimony, and since Parkman was found guilty of only second-degree murder, there was no harm or a need for a new trial. The trial court denied Parkman's motion and noted:

> Again, self-defense is an affirmative defense that has to be plead. If there are specific instances and the Defense are raising them, they should be tendered. The first thing this Court knew about the victim in this matter supposedly having a gun was the date of trial. We are to flush this stuff out before trial. The trial is not a trial by ambush. There has to be full disclosure because the Court has to rule what is relevant and what is not relevant. I believe my ruling was correct at that point in time since it was brought up at the date of trial. Again, I would agree with [the State]. The defendant was found guilty of second-degree murder. Motion for new trial based on that reason is going to be denied.

¶ 32     The trial court subsequently sentenced Parkman to 14 years' imprisonment.

¶ 33     This timely appeal followed.


¶ 34                                ANALYSIS

¶ 35    On appeal, Parkman argues the State failed to prove beyond a reasonable doubt that he did not act in justified self-defense when he shot Lewis, and the trial court violated his constitutional right to present a defense when it barred Parkman from testifying about a prior incident in which Lewis allegedly possessed a gun and threatened Parkman.

¶ 36    "The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged." *People v. Brown*, 2013 IL 114196, ¶ 48. When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-330 (2000). The relevant question is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 330. A conviction will be reversed only if the evidence is so unreasonable or improbable as to create reasonable doubt of Parkman's guilt. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 37    Section 9-1 of the Criminal Code of 1961 (Code) defines the offense of first-degree murder, in pertinent part:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1 (West 2012).

¶ 38    A person commits the offense of second degree murder when he or she commits the offense of first degree murder and either (1) at the time of the killing he or she was acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavored to kill, but he or she negligently or accidentally caused the death of the individual killed; or (2) at the time of the killing he or she believed the circumstances to be such that, if they existed, would justify or exonerate the killing, but his or her belief was unreasonable. 720 ILCS 5/9-2 (West 2012).

¶ 39    After the State has established the elements of first-degree murder, the trier of fact next addresses the issue of lawful justification. *People v. Washington*, 2012 IL 110283, ¶ 34. To raise self-defense, a defendant must establish some evidence of each of the following factors: "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *Id.* ¶ 35. "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2012). However, when the use of force is intended or likely to cause death or great bodily harm, a person is justified only if the person reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. *Id.*

¶ 40    When a defendant raises self-defense, the State has the burden of proving all the elements of the charged offense, and of disproving at least one self-defense element, beyond a reasonable

doubt. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). A defendant's belief is not necessarily an element that the State is required to disprove in defeating a claim of self-defense. *Id.* at 128. Rather, it is only one of six factors of self-defense that the State may choose to rebut, and if the State negates any one of the factors, the defendant's self-defense claim fails. *Id.* When a defendant is found guilty of second-degree murder, the trier of fact has, in essence, concluded that the evidence the defendant has offered was insufficient to support his claim of self-defense. *Id.* at 129. However, the defendant has proven by a preponderance of the evidence the existence of a mitigating factor sufficient to reduce the offense of first-degree murder to second-degree murder. *Id.*

¶ 41    In this case, the State was required to prove all the elements of first-degree murder and negate at least one element of self-defense. Parkman argues that the evidence established each element of self-defense, and the State has failed to disprove any of them. We disagree.

¶ 42    Parkman did not establish that he actually and subjectively believed a danger existed that required the use of deadly force. Lewis did not possess or display a gun during his altercation with Parkman. The evidence revealed that Watkins possessed the gun. Parkman claims that Watkins's presence with a gun would cause a reasonable person to act with deadly force. Parkman testified that when he shot Lewis, Lewis was the only person near him. Based upon Parkman's testimony, Watkins had already walked back to the vehicle prior to Parkman shooting Lewis.

¶ 43    The State disproved beyond a reasonable doubt that Parkman reasonably believed he needed to defend himself with deadly force. The use of deadly force is justified only if the person reasonably believes that such force is necessary to prevent imminent death or great

14

bodily harm to himself or another, or the commission of a forcible felony. 720 ILCS 5/7-1(a) (West 2012). Parkman argues that his force was necessary to prevent imminent death or great bodily harm. He testified that Lewis after swung at him and missed, Parkman stumbled and shot Lewis. After being shot, Lewis tried to grab Parkman and Parkman shot him again. However, using deadly force for a missed punch from an unarmed person is not reasonable in this case.

¶ 44    Relying on *People v. White*, 87 Ill. App. 3d 321 (1980), Parkman argues that he made a split-second decision that did not have to be unquestionably perfect. However, *White* is distinguishable. In *White*, the defendant shot the victim after the victim went to the defendant's apartment and argued with him. The evidence revealed a history of animosity between them and an argument earlier that evening. The victim went to the defendant's apartment brandishing a knife and making threats. The defendant warned the victim to leave, but the victim continued to approach. Defendant fired one shot, killing the victim. The defendant was later convicted of manslaughter. On appeal, the defendant argued that the State did not prove beyond a reasonable doubt that he was not acting in self-defense. The court noted that the defendant testified that the victim had brandished a knife and threatened the defendant's life on the night of the murder. *Id*. at 323. Moreover, there was uncontroverted evidence that the victim had cut the defendant with a knife several months prior. Accordingly, the defendant's conviction was reversed. *Id*. at 324.

¶ 45    Unlike in *White*, Lewis had no weapon and did not threaten Parkman at the time of the shooting. There was also no uncontroverted evidence that Lewis ever physically harmed Parkman. Parkman did not need to be perfect in his decision making. He needed only to be

reasonable, which he was not. Lewis's attempted punch was likely the difference between a first-degree and second-degree murder conviction. However, it was not enough to escape conviction altogether. Therefore, in the light most favorable to the prosecution, the State negated at least one of the self-defense factors and Parkman's conviction for second degree murder was proper.

¶ 46    Next, Parkman argues that the trial court violated his constitutional right to present a defense when it barred him from testifying about a prior incident in which Lewis possessed a gun and threatened Parkman. Parkman argues that his claim was relative to his state of mind and the reasonableness of his actions, and it was admissible as propensity-for-violence evidence under *Lynch*. The State counters arguing that the trial court properly barred Parkman's testimony since he did not disclose evidence regarding Lewis allegedly threatening him with a firearm until after the State presented its case-in-chief. The State argues that this failure to disclose amounted to a discovery violation, and that the trial court's imposition of a sanction was proper.

¶ 47    "The Illinois Supreme Court Rules require a defendant to disclose to the State any defenses that he intends to present at trial." *People v. Guja,* 2016 IL App (1st) 140046, ¶ 59. Rule 413(d)(i) requires that a defendant furnish the State with the names and last known addresses of persons he intends to call as witnesses. Ill. S. Ct. Rule 413(d)(i). "Upon a showing of materiality, and if the request is reasonable, the court in its discretion may require disclosure to the State of relevant material and information not covered by this rule." Ill. S. Ct. Rule 413(e). Rule 415(g) "authorizes a trial court to impose sanctions for violations of a discovery

16

rule or order in felony cases." *People v. Sutton*, 349 Ill. App. 3d 608, 618 (2004). The rule provides in relevant part:

> "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." 134 Ill.2d R. 415(g)(i) (eff. Oct. 1, 1971).

¶ 48    "A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense." *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 43. Parkman argues that determining whether an individual is denied this constitutional right is reviewed *de novo*. *People v. Burgess*, 2015 IL 130657, ¶ 133. "However, when a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion." *Id.* In addition, the imposition of sanctions is reviewed under an abuse of discretion standard. *People v. Scott*, 339 Ill. App. 3d 565, 572 (2003). Abuse of discretion occurs when the trial court's decision "is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Kladis*, 2011 IL 110920, ¶ 23. (quoting *People v. Ortega*, 209 Ill. 2d 354, 359 (2004)). The trial court's ruling "will not be overturned unless the abuse of that discretion led to manifest prejudice against defendant." *Burgess*, 2015 IL 130657, ¶ 134.

¶ 49    In *Lynch*, our supreme court held that when a claim of self-defense is raised, evidence of the victim's violent and aggressive character is admissible for two distinct purposes. 104 Ill.

17

2d at 199-200. First, it may be offered to show that the defendant's knowledge of the victim's violent tendencies affected his perceptions of and reactions to the victim's behavior. *Id.* at 200. Second, it may be offered to support the defendant's version of the facts when there are conflicting accounts as to the identity of the aggressor. *Id.* If the testimony is offered to show the defendant's state of mind, the defendant must have known the information about the victim when the alleged self-defense occurred; if the testimony is offered as evidence of the victim's violent character to establish that the victim was the aggressor, the defendant is not required to possess knowledge of the victim's reputation. *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 49.

¶ 50    In this case, it is undisputed that Parkman informed the State of his intent to assert the affirmative defense of self-defense. However, at the hearing on the State's motion to bar *Lynch* material, the trial court was unclear on the specifics of Parkman's self-defense claim and requested that defense counsel elaborate. Counsel explained that the claim was based on Lewis physically attacking Parkman and Parkman doing what was "absolutely necessary to defend himself." Counsel sought to introduce *Lynch* material to show that Lewis was the first aggressor but did not mention the July 2012 incident where Lewis allegedly threatened Parkman with a gun. The trial court then asked whether the two men knew each other, which counsel confirmed they did. Again, there was no mention of the July 2012 incident. As a result, the State believed that Parkman's self-defense claims only concerned the alleged attack on the day of the shooting. When Parkman attempted to testify about the July 2012 incident at trial, the State argued that it was taken by surprise, and the trial court found the proposed testimony "fundamentally unfair" to the State.

18

¶ 51    Parkman argues that because the July 2012 incident concerned his state of mind, he was not required to disclose it. The purpose of discovery is not to provide a preview of a defendant's testimony, but to "prevent surprise or unfair advantage and to aid in the search for the truth." *Sutton*, 349 Ill. App. 3d at 618-19. The issue with Parkman's proposed testimony was that it offered a new basis for his self-defense claim; one of which the State was not made aware.

¶ 52    Parkman cites *People v. Hamilton*, 2019 IL (1st) 170019, which is distinguishable. In *Hamilton*, the defendant was charged with first-degree murder after he shot and killed the victim following a physical altercation. 2019 IL (1st) 170019, ¶¶ 3-6. At trial, the defendant's wife was not allowed to testify about whether she ever saw the victim with a gun. *Id.* ¶ 10. The trial court found her proposed testimony to be irrelevant conjecture. *Id.* Likewise, the defendant was not allowed to testify about his awareness of the victim's habit of carrying a gun. *Id.* ¶ 18. The appellate court found that *Lynch* was irrelevant to the defendant's testimony because his testimony was not that the victim had a propensity for violence, but that he knew that the victim carried a gun. *Id.* ¶ 34. Further, the appellate court found his testimony relevant for the "limited and nuanced purpose of representing the defendant's state of mind" at the time he shot the victim. *Id.* ¶ 35.

¶ 53    In this case, Parkman's account that Lewis previously threatened him with a gun was more than just an awareness that Lewis carried a gun; it detailed a specific violent incident and how that incident affected Parkman's reactions to the victim's behavior. Unlike in *Hamilton*, the trial court allowed Parkman to testify about his knowledge that Lewis had previously carried a gun. Thus, Parkman was able to testify about his state of mind at the time of the shooting. The trial court did not allow Parkman to testify about being threatened with a gun in July 2012

because that proposed testimony went toward Lewis's violent tendency and should have been disclosed. Although the State may have been aware of the July 2012 incident, the State was not informed that the incident would be raised. See *People v. Gracey*, 104 Ill.App.3d 133, 135 (1982). Moreover, the State had a substantially different version of this incident. Parkman attempting to testify about his version for the first time at trial was a surprise to the State. The trial court noted, Parkman cannot "just lay in the weed" and bring up whatever he wants with no opportunity for the State to rebut.

¶ 54      "A trial court may properly fashion a sanction for a discovery violation when it is proportionate to the magnitude of the violation." *People v. Cunningham,* 2018 IL App (1st) 153367, ¶ 57. The correct sanction to be applied for a discovery violation is a decision appropriately left to the discretion of the trial court. *People v. Morgan*, 112 Ill.2d 111, 135 (1986). Here, the record establishes that the sanction imposed by the trial court did not preclude Parkman's testimony that Parkman previously witnessed Lewis possessing a gun. The trial court exercised its discretion in choosing from the spectrum of available options and narrowly tailoring its sanction to bar Parkman from introducing testimony that was not previously disclosed. Accordingly, the trial court did not abuse its discretion when it barred Parkman's testimony about the July 2012 incident.

¶ 55      Parkman also argues that defense counsel was ineffective for not disclosing Parkman's testimony or seeking its allowance sooner. A criminal defendant has a right to effective assistance of counsel. U.S. Const. amends. VI, XIV; Ill. Const. Art. I, Sec. 8. A claim alleging ineffective assistance is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. Under *Strickland*, a defendant must

prove both (1) deficient performance by counsel and (2) prejudice to defendant. *People v. Colon*, 225 Ill.2d 125, 135 (2007). To satisfy the first prong, a defendant must demonstrate counsel's performance was objectively unreasonable under prevailing norms. *People v. Domagala*, 2013 IL 113688, ¶ 36. "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill.2d 312, 341–42 (2007). To satisfy the second prong, prejudice is demonstrated if there is a "reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome of the proceeding." *People v. Colon*, 225 Ill. 2d. 125, 135 (2007). The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *People v. Albanese*, 104 Ill.2d 504, 527 (1984).

¶ 56    Parkman argues that counsel had no strategic reason for failing to disclose Parkman's excluded testimony to the State prior to trial, which led to a violation of discovery rules. Further, Parkman maintains that there is a reasonable probability that the jury would have acquitted him outright rather than find him guilty of second-degree murder if counsel had disclosed the evidence sooner. We disagree.

¶ 57    If trial counsel were deficient in her representation by failing to disclose specific details of Parkman's self-defense argument, Parkman suffered no prejudice because the trial court

21

allowed Parkman to testify that he had seen Lewis with a firearm previously. Additionally, the jury heard testimony from multiple witnesses about Lewis's propensity for violence. Parkman's additional testimony regarding Lewis threatening him with a gun a year prior, would not have made his belief that deadly force was required objectively reasonable. As such, there is no reasonable probability that the outcome of Parkman's proceeding would have been different. Therefore, Parkman failed to satisfy the prejudice prong of the *Strickland* test, which precludes a finding of ineffective assistance of counsel.

¶ 58                                          CONCLUSION

¶ 59        For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 60        Affirmed.