**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200080-U

Order filed November 7, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0080 Circuit No. 18-CM-687 |
| BRANDON DEVONNE MORRISON, | ) ) ) | Honorable Norma Kauzlarich, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Davenport concurred in the judgment.
Justice McDade dissented.

_____

**ORDER**

¶ 1     *Held*:  The circuit court did not abandon its role as a neutral arbiter and become an advocate for the State.

¶ 2     The defendant, Brandon Devonne Morrison, appeals his convictions for unlawful violation of an order of protection and reckless driving. The defendant argues that the Rock Island County circuit court repeatedly abandoned its role as a neutral arbiter and became an advocate for the State, violating the defendant's due process rights.

¶ 3                                    I. BACKGROUND

¶ 4            On July 13, 2018, the State filed a two-count information charging the defendant with

unlawful violation of an order of protection (720 ILCS 5/12-3.4(a) (West 2018)) and reckless

driving (625 ILCS 5/11-503(a)(1) (West 2018)), both Class A misdemeanors. The case

proceeded to jury trial on December 3, 2019.

¶ 5            During jury selection, the court asked whether the empaneled venire members had any

preconceived notions about the criminal justice system. Following the question, the court

explained:

> "And I always tell people, how many of you have seen that show Bull, B-
>
> u-l-l? I hate that show. I watched it the first time and I barely got through it and I
>
> thought, well, maybe I'm just kind of not keeping an open mind. I will watch it
>
> again. And I couldn't get through 15 minutes because—and I think that's where a
>
> lot of people get these preconceived ideas, like from CSI and all that. We are in
>
> Rock Island County. We ain't got money for that. Okay? We don't have anybody
>
> going through your garbage. We don't have anybody—I don't have anybody in
>
> the back swiping onto a screen telling me all kinds of information about you. We
>
> just—we don't do that. We are little Rock Island County, so don't—we don't do
>
> any of that. We don't—we just don't have that stuff.
>
> So—and maybe in bigger cities they do, but here we do not. So that's what
>
> I'm talking about when I say "preconceived ideas[.]"

The court briefly mentioned the same television shows to the next panel of venire members when

inquiring about preconceived ideas regarding the criminal justice system, asking:

"And then that long, drawn-out question about any preconceived ideas about the criminal justice system that would prevent you from being fair and impartial? I use that CSI stuff and the Bull and all that. Anybody? Raise your hand if you have any preconceived ideas about the criminal justice system."

None of the potential jurors raised their hands.

¶ 6 After the jurors were selected, the State presented its opening statement. It spoke at length about the evidence it intended to present during trial. When the State mentioned its video evidence, they stated:

"Now, the videos, as the judge was sort of saying, Rock Island County doesn't have fancy, high resolution stuff where we are able to swivel around 360 degrees at high resolution. We are stuck with these motion-activated cameras that sort of take snapshots. So if you are, you know, walking down the street, you know, and this camera, it looks sort of like—it looks like a teleporter. That's how the video works. But what we are able to do is we are able to zoom in and enlarge the images, and while the quality does degrade—unlike what happens on CSI— we are able to make out the license plate in a couple of the images."

¶ 7 The State's evidence at trial showed that the defendant and the victim, Amanda Dykeman, were in court on July 12, 2018, for a hearing on an existing order of protection which Dykeman had against the defendant. The order of protection had been served on the defendant on July 2, 2018, and required, among other things, that the defendant not come within 500 feet of Dykeman. Dykeman was accompanied to court that day by her friend, Christine Palmer. As Dykeman and Palmer were driving out of the parking lot of the Rock Island County courthouse, the defendant pulled his Chevy Tahoe beside them. He pulled around the driver's side of

Dykeman's vehicle, stopping briefly. The defendant's vehicle was inches away from Dykeman's. The defendant "stuck his middle finger up" and said something that Dykeman could not hear because her vehicle windows were closed. The defendant then "cut her off and accelerate[d] onto Third Avenue" where he nearly collided with another vehicle. The State presented surveillance video footage of the incident. The driver of the Tahoe cannot be identified from the video; however, the license plate number was visible. The Tahoe was registered to the defendant. Both Palmer and Dykeman testified that they observed the defendant as the driver of the Tahoe that day.

¶ 8       During Dykeman's testimony, she was asked about a letter of recantation that she had written in August of 2019. The letter indicated that the defendant was not the person who drove recklessly near her on July 12, 2018, and that she had begged Palmer to lie and identify the defendant as the offender. On redirect, she explained that she had been living with the defendant at the time she wrote the letter, and he wanted her to write it. She did so because she was afraid of what he might do. She indicated that he had been physically abusive in the past. The State questioned Dykeman about various harassing behaviors that the defendant engaged in. During this questioning, the following exchange occurred:

"[THE STATE]: Has he ever slashed your tires?

[DYKEMAN]: Multiple times.

[THE STATE]: Has he ever harassed you on social media?

[DYKEMAN]: Multiple times.

[THE STATE]: Has he sent you harassing text messages and phone calls?

[DEFENSE COUNSEL]: Objection. Relevancy.

[THE STATE]: It goes to the motive for her writing the letter.

4

[DYKEMAN]: Daily for months."

¶ 9        After the State rested, defense counsel announced that he would call two witnesses, the defendant's stepfather, Robert Brown, and the defendant. The State informed the court that no affirmative defense had been filed and Brown, the defendant's alibi witness, had not been previously disclosed. The State requested and was granted the opportunity to *voir dire* Brown outside of the presence of the jury. Brown testified that he attended court with the defendant on July 12, 2018, and had driven them in his vehicle, a white Buick Regal. He indicated to the State that he did not disclose this information to defense counsel until a couple of weeks before the trial in November 2019.

¶ 10       After the *voir dire* of Brown, the court took judicial notice of other court dates that occurred in the order of protection and family cases involving Dykeman and the defendant, "to make everything fair, since [defense counsel] [wa]s calling Mr. Brown." Outside the presence of the jury, it informed the parties of the minutes of each of these dates and opined that:

"there were at least two other court appearances wherein Mr. Brown may or may not have been present in 2018.

So it doesn't necessarily mean it was July 12th. He very well could have accompanied [the defendant], but it may not—I don't know that [the State] asked him a specific date. What he said and Mr. Brown's testimony was he came up here regarding the order of protection and other matters relating to [the minor child].

So that, to me, indicates that that was September 25th of 2018.

5

So that's up to you. If you want to call him, *** that's fine. If you do, the

State will be allowed to bring up all the other instances that the parties had court

regarding the order of protection and the parentage of the minor child."

¶ 11 When the trial resumed and Brown testified in front of the jury, the State asked him how he knew the events that they were discussing occurred on July 12, 2018. Brown responded that he knew the date because his son's first birthday was two days prior to the events on July 10. The State repeatedly questioned the lateness of his coming forward with the information, highlighting that the event occurred on July 12, 2018, and he failed to disclose such important information until November 2019. The State did not mention any of the other court dates that the court had disclosed to the parties following the *voir dire* of Brown.

¶ 12 During closing arguments, the State again mentioned the television show, CSI in relation to its video evidence, stating that:

"as the judge pointed out, we are not having the highest quality stuff here. I wish we could have the stuff we have in CSI, but we are left with blurry, pixelly stuff that we have to zoom in on and focus on individual frames because it's motion-activated. We can't have high definition stuff."

¶ 13 The jury convicted the defendant on both counts. The defendant was sentenced to time served in the county jail. The defendant appeals.

¶ 14                                    II. ANALYSIS

¶ 15 The defendant argues that he was deprived of his due process right to a trial before an impartial and disinterested tribunal when the circuit court abandoned its role as a neutral arbiter and became an advocate for the State. The defendant acknowledges that he failed to properly preserve this issue but asks for review under the second prong of the plain error doctrine.

6

¶ 16    The first step in any plain error doctrine is to determine whether a clear, obvious, or plain error was committed. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). When such a plain error occurs, the next step is to determine whether that plain error is reversible. *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). Under the second prong, a plain error is reversible when the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* at 565.

¶ 17    A criminal defendant has a right, under the due process clause, to an impartial and disinterested tribunal. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). This disinterested tribunal "preserves both the appearance and reality of fairness." *Id.* The defendant advances three main arguments in support of his position that the court was not impartial and disinterested. According to the defendant, the court: (1) mitigated weaknesses in the State's evidence and provided the State with a theme to excuse the poor quality of its evidence by invoking the television show, CSI, during *voir dire*, (2) aligned itself with the State by suggesting a strategy for impeaching Brown's testimony, and (3) demonstrated a lack of neutrality by allowing the State to overrule a defense objection during the examination of the victim regarding her recantation letter.

¶ 18    First, "[t]he purpose of the *voir dire* examination is to assure the selection of an impartial jury; it is not to be used as a means of indoctrinating a jury, or impaneling a jury with a particular predisposition." *People v. Bowel*, 111 Ill. 2d 58, 64 (1986). "Broad questions are generally permissible." *People v. Rinehart*, 2012 IL 111719, ¶ 17. The standard of review applicable to a court's manner and scope of *voir dire* examination is abuse of discretion. *Id.* ¶ 16.

¶ 19    Here, the court asked the venire members if they had any potential preconceived ideas regarding the criminal justice system. It further explained this by briefly mentioning two

7

television shows which focused on the criminal justice system, Bull and CSI. The court's explanation is not tailored to the State's evidence and makes no mention of any video evidence, cameras, or quality. The court's broad language makes its intent clear. "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). It is hardly improper for the court to inquire about any preconceived ideas the venire members may have garnered from television shows about the evidence they might have expected to be presented in a criminal case. *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 88.

¶ 20        Second, the parties agree that the court could *sua sponte* take judicial notice of the other order of protection and family proceedings between the defendant and Dykeman. Courts may take judicial notice, whether requested or not, of matters which are commonly known or are readily verifiable from sources of indisputable accuracy. Ill. R. Evid. 201(b), (c) (eff. Jan. 1, 2011). The defendant contends that the context in which the court took this notice establishes its lack of neutrality and bias in favor of the State.

¶ 21        Here, the court informed the parties that it was taking notice of prior court dates in the parties' order of protection and family proceedings. Brown was an alibi witness that was disclosed to the State after it had rested its case. "The purpose of the discovery rules is to eliminate surprise and unfairness and to afford an opportunity to investigate." *People v. Sutton*, 349 Ill. App. 3d 608, 618-19 (2004). In the interest of fairness, since the State had been afforded no opportunity to investigate Brown, the court disclosed relevant information regarding two other court dates which occurred in the underlying order of protection case. This action allowed

the State to be aware that other court dates had occurred and the defendant was put on notice that should Brown testify, he may be subject to impeachment. The State chose not to use this information to attempt to impeach Brown during his testimony, focusing instead, as it had in the *voir dire*, on the length of time it took Brown to come forward.

¶ 22 Third, the defendant claims that the court demonstrated bias where it allowed the State to overrule an objection that it made during the examination of Dykeman. Where the court fails to rule on an objection, the objecting party must "request a ruling or call the [court]'s attention to the fact that no ruling had been made." *People v. Caballero*, 102 Ill. 2d 23, 38 (1984). However, the defendant argues that the objection itself is not the concern, but the way the State was allowed to overrule it, which indicates bias on the part of the court. The record clearly demonstrates that defense counsel objected on relevancy grounds. The State responded by explaining the relevancy of the question. Subsequently, the record indicates the court made no ruling on the objection and Dykeman proceeded to answer. No judicial bias can be found in this exchange.

¶ 23 It is clear from the record that the court conducted itself in an impartial and fair manner during the defendant's trial. Nothing about the court's actions indicate that it abandoned its role as a neutral arbiter or advocated for the State. Accordingly, we find that no plain error occurred.

¶ 24 III. CONCLUSION

¶ 25 The judgment of the circuit court of Rock Island County is affirmed.

¶ 26 Affirmed.

¶ 27 JUSTICE McDADE, dissenting:

¶ 28 I respectfully dissent from the majority's decision. The majority finds that the circuit court "conducted itself in an impartial and fair manner" and "[n]othing about the court's actions

9

indicate that it abandoned its role as a neutral arbiter or advocated for the State." *Supra* ¶ 23. I disagree. The judge in this case had been a prosecutor for many years and continued, in my opinion, to act in such a manner during defendant's trial. This began during *voir dire* when the court preemptively excused any weaknesses in the State's case by stating that the evidence presented would not be like that shown on television. The court discussed "preconceived ideas," from CSI, but provided no basis for such notions. *Supra* ¶ 5. Nor did the court present any other non-television examples of "preconceived ideas" for potential jurors to consider. The State picked up this idea of "little Rock Island County" not having CSI-quality evidence gathering capabilities and repeated it in both its opening statement and closing argument. Moreover, the court continued to act as an advocate for the State throughout the trial, by *sua sponte* searching through the docket of defendant's civil cases, providing the factual support for the State's impeachment of Brown, and allowing the prosecution to overrule the defense's relevancy objection which allowed prejudicial information regarding prior harassment into evidence.

¶ 29 Based on the above, I would find that a clear and obvious error occurred. I would also find that the error amounted to second prong plain error as it was so serious that it affected the fairness of the trial. See *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 45. Therefore, I would reverse defendant's convictions and remand for a new trial.